821 A.2d 459 (2003)
374 Md. 199
Donald Antonio WHITE, Jr.
v.
STATE of Maryland.
No. 17, Sept. Term, 2002.
Court of Appeals of Maryland.
April 15, 2003.
*460 Geraldine K. Sweeney, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner/cross-respondent.
Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent/cross-petitioner.
*461 Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.
RAKER, J.
We granted certiorari in this case to decide two questions: whether the Court of Special Appeals should have applied Dingle v. State, 361 Md. 1, 759 A.2d 819 (2000), in deciding whether the trial court erred in the voir dire examination of the jury venire, and whether petitioner's statement was inadmissible in evidence because the police officers interrogated him in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[1] The Court of Special Appeals, in an unreported opinion, resolved both issues in favor of the State, thus, affirming the petitioner's conviction. We shall affirm.

I.
On February 7, 2000, at J. Brown Jewelers in Baltimore County, petitioner and three other men participated in an armed robbery. An off-duty Baltimore County police officer, Bruce Prothero, was working as a security guard at the store and was shot and killed by one of the robbers. Petitioner was charged by the Grand Jury for Baltimore County with first degree murder, armed robbery, first degree assault and use of a handgun in the commission of a felony. The jury convicted him of first degree murder, armed robbery and the handgun violation. The court sentenced him to life without parole for the felony murder and a term of twenty years concurrent incarceration on the handgun violation.
The Circuit Court began jury selection on August 22 and concluded on August 23, 2000. The court first conducted general voir dire of the entire panel, followed by individual voir dire of each venire person at the bench. Four voir dire questions, in compound form, were asked by the court in the general voir dire. The questions were as follows:
"Is there any prospective juror, or a relative of a prospective juror who has ever been employed in any fashion at any time by any type of law enforcement agency, either civilian or military, and because of that employment you believe that you could not render a fair and impartial verdict in this case? If your answer is yes, please stand now and give your juror call-in number only.
"Has any member of this jury panel ever served as a juror before either as a grand juror or a petit juror and, if so, that would render you incapable of making a fair and impartial verdict in this case, if you were selected. Please stand now if your answer is yes and give your juror call-in number only.
"Is there any prospective juror who has a relative, or you, yourself, who are presently or who formerly worked either as an attorney, a law clerk, a paralegal *462 or attend a school relating the field of law and because of that you believe you could not render a fair and impartial verdict in this case, if you were selected? If your answer is yes, please stand now and give your juror call-in number only. "Is there any prospective juror who has any connection with the Maryland Crime Coalition, or other advocacy group or lobbying group for victim rights or offender punishment, specifically, handgun control, rape crisis counseling, victims rights organizations, for example, the Stephanie Roper Committee, child abuse advocates, spousal abuse, Mothers Against Drunk Driving, Students Against Drunk Driving and, because of your participation with such an organization, you believe you could not render a fair and impartial verdict in this case, if you were selected? If your answer is yes, please stand now and give your juror call-in number only."
Petitioner objected to the compound questions and asked the court to require the prospective juror to answer separately each part of the question. The court refused.
Following the general voir dire, the trial court conducted individual voir dire examination of each member of the venire panel. Over the next two days, the court questioned each prospective juror at the bench. The case had generated a great deal of media attention, and during the individual voir dire at the bench, the court's inquiry was directed specifically toward pre-trial publicity, the general question as to whether the prospective juror could be fair and impartial, issues generated by the general voir dire and any follow-up questions counsel requested the court to ask of the jurors.
The jury returned its verdict on August 24, 2000, prior to this Court's decision in Dingle, which was filed on September 15, 2000. The Circuit Court imposed sentence after the filing of that decision, however, on September 20, 2000.
Petitioner noted a timely appeal to the Court of Special Appeals. In an unreported opinion, the Court of Special Appeals affirmed, holding that Dingle v. State did not control this case for two reasons: First, that the individual voir dire conducted by the trial court insured an impartial jury, and second, that Dingle should not be applied retroactively. This Court granted petitioner's Petition for Writ of Certiorari. White v. State, 369 Md. 179, 798 A.2d 552 (2002).

II.
In Dingle, this Court held that the form of the voir dire inquiry conducted by the trial judge prevented the court from impaneling a fair and impartial jury. We reasoned that "a voir dire inquiry in which a venire person is required to respond only if his or her answer is in the affirmative to both parts of a question directed at discovering the venire persons' experiences and associations and their effect on that venire person's qualification to serve as a juror, and producing information only about those who respond ... allows, if not requires, the individual venire person to decide his or her ability to be fair and impartial." Dingle, 361 Md. at 21, 759 A.2d at 830. We concluded that "[w]ithout information bearing on the relevant experiences or associations of the affected individual venire persons who were not required to respond, the court simply does not have the ability, and, therefore, is unable to evaluate whether such persons are capable of conducting themselves impartially." Id., 759 A.2d at 830.
Petitioner argues that the two-part questions used by the trial judge in this case are virtually identical to the questions *463 condemned by this Court in Dingle. He maintains that where defense counsel made the same objections to the same voir dire questions as in Dingle and where this case had not been finally decided on direct appeal at the time Dingle was decided, the rationale of Dingle should be applied and this case should be reversed.
The State's argument is two-fold. The first argument is that the Dingle decision does not apply to cases pending on direct review. The State next argues that the individual voir dire conducted by the trial judge was distinguishable from the general voir dire conducted in Dingle and that petitioner was not denied his right to a trial before a fair and impartial jury. We agree with the State and the Court of Special Appeals that the individual voir dire conducted by the trial judge, along with the general voir dire conducted initially, satisfied the obligation and responsibility of the trial judge to ensure that petitioner was tried by a fair and impartial jury. Because we find the voir dire process in this case did not violate the holding of Dingle, it is unnecessary for this Court to determine the retroactive effect of our decision in that case and we decline to do so.
The Court of Special Appeals summarized the results of the voir dire process in the case sub judice:
"Judge Howe conducted an individual voir dire of each prospective juror to determine his or her ability to be fair and impartial. Judge Howe's individual voir dire included those prospective jurors who answered affirmatively to one of the general questions at issue. Except for three jurors, every prospective juror who answered affirmatively to a general question was either stricken for cause or not impaneled. Of the three who were not stricken, one had an uncle who was a North Carolina police officer, one had a brother who was a Maryland State Trooper stationed on the Eastern Shore, and one was a law clerk to a Maryland Circuit Court Judge. Each of these three jurors, who were deemed qualified, was extensively questioned during the individual voir dire about his or her ability to be fair and impartial. Each answered that he/she could be fair and impartial, neither counsel moved to strike them for cause, and Judge Howe deemed them qualified to serve as jurors. None of the three served on the actual jury. After making individual inquiry about the media exposure that each prospective juror had received, Judge Howe concluded her individual questioning by asking each juror if he or she could be fair and impartial. On August 22nd, of the sixty-five prospective jurors, twenty-five were struck for cause. On August 23rd, of the sixty-five prospective jurors, eighteen were struck for cause."
The Court of Special Appeals held that the voir dire conducted by the trial judge "was a long and strenuous process that resulted in the selection of a fair and impartial jury." We agree.
"Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). Without adequate voir dire, the trial judge is unable to fulfill his or her responsibility to eliminate those prospective jurors who will be unable to perform their duty impartially. See Connors v. United States, 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895). The judge, in exercising his or her responsibility, ultimately makes a credibility determination. As in any credibility assessment, a conclusion as to credibility, and hence impartiality, must be *464 reached, based on an evaluation of demeanor and responses to questions. See Ristaino v. Ross, 424 U.S. 589, 595, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976) (quoting Rideau v. Louisiana, 373 U.S. 723, 733, 83 S.Ct. 1417, 1423, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting)). Accordingly, on appellate review, great deference is paid to the conclusions of the trial judge, who had an opportunity to hear and observe the prospective juror. If the voir dire is cursory, rushed, and unduly limited, then the conclusions of the trial judge are entitled to less deference.
In Maryland, unlike some of our sister jurisdictions, the trial judge may, at his or her discretion, conduct individual voir dire out of the presence of other jurors but is not required to do so.[2]See Maryland Rule 4-312(d).[3] The purpose of voir dire is to assure the selection of an impartial panel of jurors, free from bias or prejudice. However, no formula or precise technical test exists for determining whether a prospective juror is impartial. This Court has stated repeatedly that the trial judge is vested with broad discretion in the conduct of voir dire, subject to reversal for an abuse of discretion. See Dingle, 361 Md. at 13, 759 A.2d at 826; Burch v. State, 346 Md. 253, 293, 696 A.2d 443, 463 (1997); Perry v. State, 344 Md. 204, 218, 686 A.2d 274, 280 (1996); Boyd v. State, 341 Md. 431, 436, 671 A.2d 33, 35 (1996). Further, we also have recognized that:
"[i]f there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. Otherwise, the right of trial by an impartial jury guaranteed to him ... might well be impaired...."
State v. Thomas, 369 Md. 202, 208, 798 A.2d 566, 569-70 (2002) (quoting Dingle, 361 Md. at 11, 759 A.2d at 824).
The standard for evaluating a court's exercise of discretion during the voir dire is whether the questions posed and the procedures employed have created a reasonable assurance that prejudice would be discovered if present. The disapproved Dingle-type questions, standing alone, would constitute reversible error. See Dingle, 361 Md. at 21, 759 A.2d at 830. As we made clear in Dingle, the use of the compound question permits a juror to self-assess whether that juror could be fair and impartial. Id. at 19, 759 A.2d at 828-29. It is the responsibility of the trial judge, not the juror, to make the final determination as to whether the juror can be impartial. Nonetheless, in this case, when the voir dire is viewed as a whole, the painstaking individual voir dire conducted by the trial judge created a reasonable assurance that partiality and bias would have been uncovered.[4]
*465 The trial court's exercise of discretion as to the manner in which voir dire was conducted was not an abuse of discretion. Such a procedure did not adversely affect appellant's right to a fair and impartial jury. It is clear that the trial judge understood that it was her responsibility to determine partiality or bias.[5] While individual voir dire is not required in any case in Maryland, the trial judge exercised her discretion and engaged in extensive individual, in camera, voir dire with every prospective juror. During this individual voir dire, the trial judge did not limit or foreclose any line of inquiry. Petitioner was not restricted in any way in his effort to uncover bias, prejudice or incapacity. At the bench, after the court inquired of the prospective juror, in each instance, the court asked defense counsel and the prosecutor whether there were any follow-up questions to be asked to the prospective juror. Petitioner had ample opportunity to question any prospective juror as to any bias or prejudice, arising from any source, including employment in law enforcement, contact with advocacy groups, prior jury service or any connection with lawyers, law clerks or the legal community. The trial judge asked nearly every follow up question requested by defense counsel and the prosecutor.[6]
A review of the trial court's rulings should be undertaken only on the record of the voir dire examination as a whole to determine whether the trial court abused its discretion during the voir dire process. In the instant case, when the voir dire process is viewed as a whole, it is clear that the trial court conducted extensive voir dire examinations of the prospective jurors. The voir dire process spanned over two days. The court asked the entire group of prospective jurors a series of questions designed to ensure that the jurors chosen would be free from any preconceptions, biases, or prejudices which might interfere with their ability to be fair and impartial jurors.
This individual questioning extended beyond the general voir dire questions, allowing for scrutiny of prospective jurors who had not answered affirmatively to any of the general questions. For example, prospective juror No. 300 did not respond affirmatively to any of the compound questions, nor did she claim to have seen more than minimal media exposure. When asked by the court if she could listen to the evidence presented and render *466 a fair and impartial verdict, she responded affirmatively. At defense counsel's request, the trial judge asked a series of questions regarding whether an accusation of criminal activity was sufficient, in the mind of the prospective juror, to justify a guilty verdict.[7] Defense counsel requested the court to strike the prospective juror for cause. The State, equally informed by the interchange, did not oppose the motion. The court permitted counsel to explore potential sources of subconscious prejudice, which indicates that the court proceeded in a manner envisioned in our recent decisions on proper voir dire procedure. See Thomas, 369 Md. at 208, 798 A.2d at 569-70; Dingle, 361 Md. at 11, 759 A.2d at 824. The trial court was aware that the court, and not the prospective juror, must, in the final analysis, assess the impartiality of the prospective juror.
For the majority of prospective jurors, defense counsel declined the trial judge's offer to ask additional questions. Nonetheless, such questioning was freely allowed and proved decisive in the voir dire process. For example, prospective juror No. 314 was stricken as a result of responses to individual questioning. Although he had not answered affirmatively the question on relationships to law enforcement, he indicated, in response to individual questioning, that he had friends that were in law enforcement and that he might have trouble rendering an impartial verdict.[8] At defense counsel's request, the *467 trial judge explored the extent of these relations.[9] After argument from both sides, the court struck prospective juror No. 314 for cause over the State's objection.
The potential prejudice to petitioner from the use of the compound questions was minimal. Moreover, defense counsel could have mitigated any potential harm by requesting the trial judge to inquire of the prospective juror during the individual voir dire. The trial court offered both counsel the opportunity for further inquiry with each prospective juror. While it is true that the trial court did not make inquiry sua sponte into any law enforcement connections or the subject of the earlier compound questions of the prospective jurors during the individual voir dire, it must be noted that it was the decision of defense counsel not to pursue such an inquiry when the trial court permitted follow up questions.
It appears that counsel was not dissuaded from asking questions on individual voir dire which the trial court had refused to propound to the entire venire. Prior to trial, defense counsel objected to the compound questions, asking that they be rephrased. At the same time, the defense asked that the trial court ask several questions previously requested by defense counsel for general voir dire. One of the questions, asked: "Do you believe that merely because a person has been charged by the State or by the Government with committing a crime, that the person is most likely guilty of the crime charged?" The trial court refused to ask this question at the same time it refused to re-ask the *468 compound questions in alternate form. Despite this refusal, as noted supra, on individual voir dire, the trial court, at defense counsel's request, asked prospective juror No. 300: "Do you believe that just because a person is accused of a crime means that they have to go to jail?" Thus, the trial court's refusal to ask certain questions on general voir dire neither precluded defense counsel from making subsequent inquiries into those areas, nor indicated that the court would refuse to address those areas on individual voir dire.
In light of the extensive questioning of the prospective jurors by the court during the individual process, combined with the general questions, we find no abuse of discretion in the trial court's voir dire examination.

III.
Petitioner also argues that the trial court erred in denying his motion to suppress an inculpatory statement obtained by law enforcement officers during their interrogation of him. The heart of petitioner's argument is that after he had invoked his 5th Amendment right to counsel and to remain silent, the police read the charging document to him, revealing for the first time that he was being charged with murder, and prompting the petitioner to give the inculpatory statement. He concludes that the police conduct was the "functional equivalent" of interrogation after he had invoked his right to remain silent. The Court of Special Appeals held that "providing a suspect with a Statement of Charges is administrative in nature, and does not fall under the purview of `questioning' or `interrogation.'" We agree.
Detective Philip Marll was the only witness to testify at the motion for suppression hearing. After investigation of the murder of Sgt. Prothero, Detective Marll obtained information leading to the issuance of an arrest warrant for petitioner. Detective Marll learned that petitioner was being held in the Baltimore City Detention Center. Marll obtained a writ authorizing the release of petitioner from the Baltimore City Detention Center and for his transport from Baltimore City to Baltimore County Police Department Headquarters. The arrest warrant was served on petitioner at approximately 10:30 a.m. at the Baltimore City Detention Center. Petitioner, Detective Marll and his partner, Detective James Tincher, arrived at Baltimore County Police Headquarters at approximately 11:00 a.m. At that time, petitioner was advised of his Miranda rights and, in response, stated that he wanted to remain silent and speak to an attorney. Detective Marll testified that at that point the police "were done [with] our interview." They then began "routine processing" of petitioner. Detective Marll indicated that normally the prisoner would appear before a commissioner and receive a packet of papers, including the arrest warrant and the Application for Statement of Charges. Instead of being taken directly to a court commissioner, however, in this instance, Detective Marll read petitioner the charges pending against him. At this point, petitioner was made aware for the first time that he was being charged with first degree murder and armed robbery. Apparently shocked by the disclosure that he was being charged with a murder, petitioner read the Statement of Charges for himself. He then stated, "I ain't killed nobody" and indicated that he wanted to talk to police investigators and to give a statement concerning the crime. Detective Marll testified that petitioner was advised once again of his right to remain silent and of his right to counsel, both of which petitioner waived, *469 before giving a complete statement regarding his involvement in the crime.
On appellate review, this Court will look exclusively to the record of the suppression hearing when reviewing the denial of a motion to suppress evidence. See Wengert v. State, 364 Md. 76, 84, 771 A.2d 389, 393 (2001). Furthermore, we will accept the facts as found by the hearing judge unless those facts are clearly erroneous. See Riddick v. State, 319 Md. 180, 183, 571 A.2d 1239, 1240-41 (1990). In addition, the evidence is to be viewed in the light most favorable to the prevailing party. See id., 571 A.2d at 1240-41. Nevertheless, we will undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case. See id., 571 A.2d at 1239.
This case is remarkably similar to the facts of State v. Conover, 312 Md. 33, 537 A.2d 1167 (1988), which we look to for guidance of our analysis of this issue. In Conover, the question presented was "whether the actions of the police in reading a statement of charges to the Respondent, and handing to him copies of the charging document and the application upon which it was based, constituted, under the circumstances here present, the functional equivalent of questioning, and thereby deprived Respondent of his Fifth Amendment right to have counsel present at a custodial interrogation." Id. at 35, 537 A.2d at 1168. The trial court denied the defendant's motion to suppress. On direct appeal, the Court of Special Appeals disagreed and reversed. We granted the State's petition for certiorari and reversed the Court of Special Appeals, holding that the conduct of the police did not amount to the "functional equivalence" of interrogation. Id. at 44-45, 537 A.2d at 1172. Reading the charging document to a defendant and giving the document to him, after he had invoked his Miranda rights, was not the functional equivalent of reinitiating interrogation. Id. at 38, 537 A.2d at 1169. The 5th Amendment jurisprudence we acknowledged as well settled in Conover has not changed.
"Once an accused, detained in a custodial setting, has asserted his right to counsel, all interrogation must cease until an attorney has been furnished to consult with him or he initiates further communication, exchange, or conversations. The rule in Miranda does not exclude every statement uttered by the accused before he is provided with counsel. `Volunteered statements of any kind are not barred by the Fifth Amendment....'"
Id., 537 A.2d at 1169 (citations omitted). Petitioner argues that Conover can be distinguished or in the alternative, should be reconsidered. We are not persuaded by either argument.
First, as we have seen, the rule announced by the Supreme Court in Miranda does not bar voluntary statements or, as in this case, statements made after a defendant has waived his rights to the protections of Miranda. Petitioner argues that, because the defense in Conover did not argue whether providing the defendant with a copy of the charging document was the functional equivalent of an interrogation, the record in Conover was underdeveloped on the point and, thus, could not support a finding in the defendant's favor. In contrast, petitioner states that his case contains a "well-developed record" that supports his argument. Petitioner's argument, however, may do him more harm than good. Reviewing the record in the light most favorable to the State, as the prevailing party, indicates that petitioner's statement was not the product of a Miranda violation. From Detective Marll's testimony, there are no *470 facts in the record, or inferences to be drawn from those record facts, indicating the police read the Statement of Charges to elicit an incriminating response from petitioner. Instead, the facts reflect that the officers were acting in accordance with Maryland Rule 4-212(f).[10] Police officers engaged in the procedural processing of a defendant dictated by statute are not conducting an interrogation subject to Miranda violation. See Conover, 312 Md. at 39, 537 A.2d at 1170 (citing Vines v. State, 285 Md. 369, 375, 402 A.2d 900, 904 (1979)).
Furthermore, Detective Marll testified that petitioner was given a second opportunity to invoke his right to remain silent and his right to counsel after the Statement of Charges had been read. Petitioner initialed a statement of rights forms, indicating that he understood his rights and wished to waive them. Subsequently, petitioner gave a thirty page statement. To be sure, "[i]n undertaking to prove a waiver of Miranda rights, `a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.'" McIntyre v. State, 309 Md. 607, 614-15, 526 A.2d 30, 33 (1987) (quoting Miranda, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d 694). Petitioner does not argue, however, that his waiver was ineffective; instead, in support of his contention that Conover should be reconsidered, he directs our attention to our recent decisions in Drury v. State, 368 Md. 331, 793 A.2d 567 (2002), and Hughes v. State, 346 Md. 80, 695 A.2d 132 (1997).
In Drury, we held that a statement, made by a suspect in police custody and prior to being advised of his Miranda rights, should have been suppressed. Drury, 368 Md. at 341, 793 A.2d at 573. There, however, the officer confronted the suspect with physical evidence of the crime for the purpose of eliciting an incriminating response; the police officer's conduct was the functional equivalent of interrogation. The test applied in Drury sought to determine whether the police officer's statements and exhibition of the physical evidence were tantamount to interrogation and whether the words and actions of the officer were reasonably likely to elicit incriminating responses from the accused. Id. at 336, 793 A.2d at 570; see also Williams v. State, 342 Md. 724, 760, 679 A.2d 1106, 1124-25 (1996). Addressing whether the officer's conduct could serve as the functional equivalent of interrogation in Drury, we observed:
"The police were not engaged in routine booking procedures; they were not required by any Maryland rule or procedure to read any document (other than the Miranda rights) to petitioner. Nonetheless, the officer placed the tire iron and the trash bag containing the stolen magazines on the table before petitioner before advising him of his Miranda rights. The officer told petitioner that he was going to send the evidence to be examined for fingerprints. Moreover, the officer testified that he `was presenting the evidence that was going to be used for questioning.'
"It appears to us that the only reasonable conclusion that can be drawn from the foregoing facts is that the officer should have known, in light of his having told petitioner that he was being brought in for questioning, that putting the evidence before petitioner and telling *471 him that the items were going to be fingerprinted was reasonably likely to evoke an incriminating response from him."
Drury, 368 Md. at 337, 793 A.2d at 571.
The facts and circumstances of petitioner's case stand in marked contrast to the facts and circumstances of Drury. First, petitioner was provided Miranda warnings, not once, but twice, as opposed to Drury, to whom no Miranda warnings were provided. Furthermore, as indicated, Maryland Rule 4-212(f) requires that "a copy of the charging document shall be served on the defendant promptly after it is filed." This is consistent with the motions court's finding that giving petitioner the statement of charges was a "routine part of police procedure."
In Hughes, the issue was whether the "routine booking question" exception encompasses a question on an arrest intake form as to whether the arrestee is a "narcotics or drug user." Hughes, 346 Md. at 84, 695 A.2d at 134. Answering in the negative, we explained:
"[Q]uestions that are `designed to elicit incriminatory admissions' do not fall within the narrow routine booking question exception. In some instances, it is plain from the nature of the question whether it is aimed at merely gathering pedigree information for record-keeping purposes, or whether it is directed at procuring statements by the suspect that, either in isolation or in connection with other known facts, will tend to prove the suspect's guilt.
* * *
"Even if a question appears innocuous on its face, however, it may be beyond the scope of the routine booking question exception if the officer knows or should know that the question is reasonably likely to elicit an incriminating response. Assessment of the likelihood that an otherwise routine question will evoke an incriminating response requires consideration of the totality of the circumstances in each case, with consideration given to the context in which the question is asked. The fact that the answer to a booking question assists the prosecution in proving its case is not determinative of whether a standard booking question, when posed, was likely to elicit an incriminating response. A benign question in one case may amount to `interrogation,' for which Miranda warnings are required, in another case. Therefore, `courts should carefully scrutinize the factual setting of each encounter of this type,' keeping in mind that the critical inquiry is whether the police officer, based on the totality of the circumstances, knew or should have known that the question was reasonably likely to elicit an incriminating response."
346 Md. 80, 95-96, 695 A.2d 132, 139-140 (internal citations omitted and emphasis added). Consequently, our holding in Hughes reaffirms that our case-by-case review should focus on the conduct of law enforcement officers in obtaining the incriminating statement when assessing whether a Miranda violation has taken place. Applying this principle to petitioner's case, there are no facts in the record or inferences to be drawn from those record facts that would justify a finding that petitioner's statement was obtained in violation of Miranda.
JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.
BELL, C.J., and ELDRIDGE, J., dissent.
*472 Dissenting Opinion by BELL, C.J., in which ELDRIDGE, J. joins.
It is irrefutable that the trial court permitted the use, during the voir dire in the petitioner's trial, of the type of questions this Court disapproved in Dingle, 361 Md. 1, 759 A.2d 819 (2000). The Majority acknowledges that this is so and, indeed, states that the "disapproved Dingle type questions, standing alone, would constitute reversible error." 374 Md. 232, 242, 821 A.2d 459, 464 (2003). Nonetheless, the Majority concludes that the "painstaking individual voir dire conducted by the trial judge created a reasonable assurance that partiality and bias would have been uncovered." Id. Review of the transcripts of the voir dire proceedings fails to confirm that conclusion. Thus, I dissent.
It is well settled that every person accused of a crime in this State, and, indeed, in this nation, is guaranteed the right to a trial by a fair and impartial jury.[1] To ensure that right, the prospective jurors are questioned, on voir dire, in an effort to determine whether any of them, because biased toward the defendant, or the State, or for some other reason, may not be able to render a fair and impartial verdict. State v. Thomas, 369 Md. 202, 206-208, 798 A.2d 566, 568-569 (2002); Dingle v. State, 361 Md. 1, 9-12, 759 A.2d 819, 823-825 (2000). We have recognized that:
"If there is any likelihood that some prejudices in the jurors' mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. Otherwise, the right of trial by an impartial jury guaranteed to him ... might well be impaired...."
Bedford v. State, 317 Md. 659, 671, 566 A.2d 111, 117 (1989), quoting Brown v. State, 220 Md. 29, 35, 150 A.2d 895, 897-98 (1959), quoting State v. Higgs, 143 Conn. 138, 142, 120 A.2d 152, 154 (1956). Thus, the voir dire questions should be directed at uncovering "any circumstances which may reasonably be regarded as rendering a person unfit for jury service" and therefore may be basis of a challenge for cause. Bedford, 317 Md. at 671, 566 A.2d at 117, quoting Corens v. State, 185 Md. 561, 564, 45 A.2d 340, 343 (1946).
We have also made clear that it is the trial judge that has responsibility of impaneling a fair and impartial jury. Dingle, 361 Md. at 8, 759 A.2d at 823 ("the trial judge is charged with the impaneling of the jury and must determine, in the final analysis, the fitness of the individual venire persons."). It is the trial judge who must decide whether a prospective juror is qualified *473 to serve or must be discharged for cause. Critical to the discharge of that responsibility is information that informs those decisions; without information bearing on the qualifications of the prospective jurors, the court is unable to make the critical choices and decisions so necessary to ensuring a fair jury. Voir dire inquiries of the type used in, and rejected by, Dingle, rather than facilitating the disclosure of disqualifying information, contributes to the risk that such information will not be disclosed and will remain unrevealed, thus, usurping the court's responsibility to impanel a fair and impartial jury. 361 Md. at 8-9, 759 A.2d at 823. From this, it follows that decisions relating to the propriety of the questions asked, or not allowed, on voir dire are more important than the manner in which the process is conducted. In other words, how the trial judge conducts voir dire, whatever the level of the skill displayed, no matter the number or how painstaking and detailed the inquiry, cannot substitute for asking the appropriate relevant questions. We made this very point in Dingle:
"The issue in this case is not about how well the trial court conducted the voir dire; how well the trial court may have conducted the voir dire it allowed does not impact whether it erred in the manner in which it handled the propounding of the questions at issue here. If the questions at issue here should have been asked, and answers obtained, without the State's suffix, reversal is required, however excellently the remainder of the process may have been conducted. Nor is it relevant how many persons were excused for cause. If the petitioner were potentially denied the right to challenge others, or even one person, who might have been subject to discharge because of the information generated, the many who were excused will not matter not one whit."
361 Md. at 4, n. 5, 759 A.2d at 821, n. 5.
Voir dire in this case was "a little different than the normal procedure." As the trial judge advised the venire panel:
"We will have what is called general voir dire. I am going to ask questions of all of you together first, to which I want you to respond, if your answer is yes, by standing and giving your juror call-in number. At the conclusion of the general voir dire, 35 of you will be remaining here and the other 30 will be excused until 2 p.m. this afternoon. We will then be asking each of you, separately, additional questions."
There was in this case, therefore, a general voir dire, in which all of the prospective jurors were questioned as a group, and an individual voir dire, in which each was questioned separately. Although, because those prospective jurors responding to a question on general voir dire will only have stood and given their call-in number, follow-up questions to those asked in general voir dire would be asked during the individual voir dire and, therefore, to that extent, there was overlap, the two inquiries were intended to be separate and to serve different purposes. The general voir dire, in other words, narrowed the scope of the individual voir dire to the subject matter to be pursued, as it turned out, pre-trial publicity, on that examination and the questions required to be asked as a result of the general voir dire answers.
The focus of the general voir dire was quite broad, covering such varied matters as whether the prospective jurors knew the defendant, the court counsel or witnesses, their associations, or that of relatives, to the legal system, law enforcement or victim's groups and prior jury service. Four of the questions asked during general voir dire, including those addressing the *474 prospective jurors' relationship and association to the legal profession and with law enforcement, were asked in the two part format, in compound form, that Dingle disapproved. They were:
"Is there any prospective juror, or a relative of a prospective juror who has ever been employed in any fashion at any time by any type of law enforcement agency, either civilian or military, and because of that employment you believe that you could not render a fair and impartial verdict in this case? If your answer is yes, please stand now and give your juror call-in number only.
"Has any member of this jury panel ever served as a juror before either as a grand juror or a petit juror and, if so, that would render you incapable of making a fair and impartial verdict in this case, if you were selected. Please stand now if your answer is yes and give your juror call in number only.
"Is there any prospective juror who has a relative, or you, yourself, who are presently or who formerly worked either as an attorney, a law clerk, a paralegal or attend a school relating the field of law and because of that you believe you could not render a fair and impartial verdict in this case, if you were selected? If your answer is yes, please stand now and give your juror call-in number only.
"Is there any prospective juror who has any connection with the Maryland Crime Coalition, or other advocacy group or lobbying group for victim rights or offender punishment, specifically, handgun control, rape crisis counseling, victims rights organizations, child abuse advocates, spousal abuse, Mother Against Drunk Driving, Student Against Drunk Driving and because of your participation with such an organization, you believe you could not render a fair an impartial verdict in this case, if you were selected? If your answer is yes, please stand now and give your juror call-in number only."
As phrased, a juror could answer the first question in the affirmative and yet not be required to reveal the information it sought because the juror decided that he or she could be fair and impartial. Only if a juror to whom the question applied decided that he or she could not be fair and impartial would the information the question sought have to be disclosed. Thus, although having the association or relationship, the juror and only the juror controlled, under this formulation of the question whether or not to disclose.[2]
*475 The petitioner objected to these compound questions, explaining:
"Your Honor, we take exwe would ask that the Court, your Honor, as to law enforcement questions which you then limited asked saying would that affect your ability to serve and function as a juror, I would ask that you ask that question as you did the victim witness or defendant question, and if that question did not so limit it, I would ask that you ask the law enforcement question and not limit it, not put the qualification, have that information supplied and then recommend a determination of whether or not that's appropriate.
"Court did the same thing on one of the other questions concerning that a juror before an attorney, law clerk, [sic] handle its members of the advocacy group. Court also limited that. That is [,] allowed the jury to make the lone independent determination. I think we're entitled to that information so we can make or our [sic] determination. So I would ask the Court re-ask those questions and not so limit them."
The Court "decline[d] to do that."
Other questions on general voir dire, as, for example,
"Has any prospective juror or any member of your family ever been the victim of, charged with or convicted of a crime? This does not include minor traffic offenses. If your answer is yes, please stand now and give your juror call in number only,"
were not asked in the two-part format; rather, the information was sought simply and directly.[3] As to those questions, the information sought was revealed by the answer, without the necessity of the prospective juror deciding whether he or she could be fair and whether, on that account, to disclose the information.
Following the completion of the general voir dire, the trial judge conducted individual voir dire of each of the prospective jurors at the bench. Before beginning the process, however, she advised the entire panel, by way of introduction:

*476 "Donald Antonio white, Troy White, who is not related to Donald Antonio White, Richard Antonio Moore and Wesley John Moore are charged with the armed robbery of the J. Brown Jewelers on Reisterstown Road in Baltimore County, Maryland and with the murder of Baltimore County Police Sergeant Bruce Prothero on February 7th of 2000. Those are the allegations of this case.
"With that in mind, I will now begin the individual voir dire process, and I would ask that counsel and the Defendant approach the bench."
This was the first mention of the facts of the case and it serves to explain the court's statement that it would be "asking each of you, separately, additional questions."[4] The case had received extensive media attention and coverage. That is undoubtedly the reason for the court's decision to voir dire the panel individually. That certainly was the primary focus of that phase of the voir dire, although, to be sure, those prospective jurors who answered questions during the general voir dire, were questioned with respect to the information their answers revealed. The court also permitted counsel, both defense and State, to ask follow-up questions as required. Although somewhat lengthy, the voir dire of the second prospective juror individually questioned is instructive and illustrative:
"THE COURT: ... Juror 53. Mr. Morton?
"JUROR: Yes.
"THE COURT: You heard me give a description of the allegations of the facts in this case?
"JUROR: Yes.
"THE COURT: Have you read, heard, or seen or do you have any personal knowledge about the allegations of the facts of this case?
"JUROR: I don't read newspapers, and I see very little television, but I do recall hearing something when this first happened.
"THE COURT: Okay. Have you discussed this case with anyone?
"JUROR: No. No, I didn't even
*477 "THE COURT: Have you been told anything about the anticipation or the facts of this case, or Mr. White or
"JUROR: No.
"THE COURT:Mr. Prothero's
"JUROR: No.
"THE COURT: Okay.
"JUROR: I got an impression, too, at, with what a little bit I heard. That it was something red and handled about the way they were red-handed apprehended.
"THE COURT: All right. Do you believe that you have an ability to serve as a juror in this Case? That means to sit in the jury box, to listen to the entire case, all of the evidence presented without pre-forming any opinion as to the guilt of the Defendant, and then to base a fair and impartial verdict only on the evidence in this case as you will see and hear it, and on the instructions on the law as I would give them to you at the end of the case?
"JUROR: I don't know.
"THE COURT: And what reservation do you have?
"JUROR: The only reservation I have is, is the impression that I have, had originally formed
"THE COURT: All right.
"JUROR:some months ago that's all.
"THE COURT: You believe that you can put that impression aside
"JUROR: Yes.
"THE COURT:as I would, and I would instruct you to do that? Okay. Do you have any fears about serving as a juror in this case?
"JUROR: Fears?
"THE COURT: Mm-hmm.
"JUROR: No.
"THE COURT: Based on anything you have read, seen or heard about the facts of the case, have you reached an opinion or judgment on the facts of the case or on the guilt or innocence of Mr. White?
"JUROR: No.
THE COURT: Do you believe that you can return and [sic] fair and impartial verdict in this case. Based only on the evidence and the law?
"JUROR: Well, some of thisif somebody let me go to a dentist sometime soon. I broke a tooth yesterday, which is tearing my tongue and making it bleed every time I swallow, probably.
"THE COURT: If you understood that you would not probably return to either be chosen or not chosen until Wednesday morning. Would that give you sufficient time to make a dental appointment?
"JUROR: I suspect it would. My mother's flying in from out of town Wednesday morning.
"THE COURT: Okay. Did you answer yes to any other question asked?
"PROSECUTOR: Yes, he did, your Honor. He answered the hardship question.
"JUROR: That's
"THE COURT: You answered the
"JUROR:The hardship.
"THE COURT: And what is the hardship?
"JUROR: One, the broken tooth; two, I'm a self-employed contractor; it's, it's a lot more expensive for me to be here than for someone who has a regular job. If I don't work I don't make any money, and nor does my employee.
"THE COURT: Okay.
"JUROR:as well as my mother coming to visit for a week from Florida on Wednesday, I didn't feel like I could postpone this, `cause I already postponed it twice.
*478 "THE COURT: Okay. [State's Attorney]?
"MS. BROEST: I don't have any follow-up questions.
"THE COURT: [Defense Counsel]?
"DEFENSE COUNSEL: If I may, your Honor.
"THE COURT: Mm-hmm. You ask me to ask the question, please.
"DEFENSE COUNSEL: Your Honor, would you ask, please ask a follow-up, what, what the juror meant by the red-handed I, I didn't
"THE COURT: Would you explain what you meant by red-handed?
"JUROR: I, just the impression that I formed was, was that it, it seemed kind of clear and linear that fellas who were apprehended, I mean, there seemed to be a fairly linear connection as what was presented through the news to the crime.
"THE COURT: Okay. You've indicated you can put that aside and return a fair and impartial verdict; is that correct?
"JUROR: Hope so.
"THE COURT: Okay. Anything, anything else, [Defense Counsel]?
"DEFENSE COUNSEL: No, your Honor.
"THE COURT: Would you step back as far as the trial table, please
"JUROR: Sure.
"THE COURT:and remain there for a moment. Accepted by State?
"PROSECUTOR: Yes, your Honor.
"THE COURT: Accepted by the Defendant?
"DEFENSE COUNSEL: Your Honor, I believe, I move that we disqualify Mr. Morton, juror here for cause. He hesitatingly indicated he had some concerns. He, he is a, stated he described to the Court his definition of red-handed, which is this linear, what I interpret that to be there's a clear connection between the crime and he's guilty [of] the crime. I would move to strike this juror for cause.
"THE COURT: State's position?
"PROSECUTOR: Your Honor, I ask one, briefly. There's nothe didn't replay any fact
"THE COURT: Hmm.
"PROSECUTOR:that is set in his mind, which the evidence would have to overcome. And when you look at some of the case law on what type the publicity disqualifies a jury from service, do they happen to know specific facts
"THE COURT: Mm-hmm.
"PROSECUTOR:that would otherwise be admitted into court which might somehow unfairly prejudice the Defendant?
"PROSECUTOR: He described the impression from news media that somehow the people that were caught were involved in this offense, but he knows of no specific facts. There's nothing that the, the Defense would have to overcome in terms of persuading him that something he heard was not true or significant, anything like that which could suggest that he could be fair and impartial. And that is, in fact, the way he answered. I took his hesitation to simply mean that he was, simply thought about the question asked by the Court instead of simply answering offhanded.
"THE COURT: I would decline to strike the juror for cause.
All right. Mr. Morton, could you step up, please. Mr. Morton, you've been accepted as a qualified juror in this Case. That means the actual jury selection, as I told you, will not take place today. You're required to call the Jury *479 Office at the telephone number listed on this paper after 4:30 on Tuesday, August 22nd and listen to the instructions that will be given on that tape for Judge Howe's jurors. And I want to give you this piece of paper. It's imperative that you not discuss this case be anybody, read anything, listen to anything or see anything about it on television, on the radio, in the newspapers, before you come back the next day, okay?
"JUROR: (Nodding head yes.)
"THE COURT: So you can take this paper with you.
"JUROR: Okay.
"THE COURT: Thank you.
"JUROR: Thank you.
The majority makes a great deal of the fact that the "trial court conducted extensive voir dire examinations of the prospective jurors," that the process exceeded two days in length and consisted of "a series of questions designed to ensure that the jurors chosen would be free from any preconceptions, biases, or prejudices which might interfere with their ability to be fair and impartial jurors." 374 Md. at 244, 821 A.2d at 465. It concludes:
"During this individual voir dire, the trial judge did not limit or foreclose any line of inquiry. Petitioner was not restricted in any way in his effort to uncover bias, prejudice or incapacity. At the bench, after the court inquired of the prospective juror, in each instance, the court asked defense counsel and the prosecutor whether there were any follow-up questions to be asked to the prospective juror. Petitioner had ample opportunity to question any prospective juror as to any bias or prejudice, arising from any source, including employment in law enforcement, contact with advocacy groups, prior jury service or any connection with lawyers, law clerks or the legal community. The trial judge asked nearly every follow up question requested by defense counsel and the prosecutor."
Id. at 243, 821 A.2d at 465 (footnote omitted).[5]
Aware of the need for the voir dire at the bench to negate the effect of the compound questions and the court's refusal, even after objection, to ask the compound questions separately, the majority states that the "individual questioning extended beyond the general voir dire questions, allowing for scrutiny of prospective jurors who had not answered affirmatively to any of the general questions." Id. at 244, 821 A.2d at 465. Citing as examples the questioning of Juror 300 and 314, the majority notes that the former was stricken for cause after the series of questions requested by the petitioner were asked, id. at 243-45, 821 A.2d at 465-66, and offers the latter as proof that "the trial judge's offer to ask additional questions" was "freely allowed" and of the decisiveness of those questions when the offer was accepted. Id. at 245-47, 821 A.2d at 466-67.
*480 The majority seems to recognize that the petitioner was prejudiced by the use of the compound question, but characterizes the prejudice as "minimal." id. at 247, 821 A.2d at 467. It faults the petitioner for not having requested the trial court to inquire once again of the prospective jurors on the subject of the two-part questions. Id. After all, it states, the petitioner could have mitigated the prejudice and, in any event, because the trial judge offered the petitioner and the State "the opportunity for further inquiry with each prospective juror," the petitioner should be held responsible for "the decision of defense counsel not to pursue such an inquiry when the trial court permitted follow up questions." Id. Finally, using prospective Juror 300 as the example, the majority contends that the petitioner "was not dissuaded from asking questions on individual voir dire which the trial court had refused to propound to the entire venire." Id.
I am not persuaded. Indeed, to state the majority's rationale is to refute it; as hard as it strains to fit this case into a harmless error posture, it cannot. I started by pointing out that the trial court committed error by propounding the four two-part questions. The majority agrees. Thus, to affirm, it must determine that any prejudice that would flow from the failure to ask the questions properly has been dissipated by the subsequent proceedings or that the information that would have been elicited had the questions been asked properly was either elicited or the opportunity to do so was provided. The majority has failed to demonstrate that either occurred.
At the outset, as already pointed out, error committed in the propounding of voir dire questions cannot be cured or mitigated by conducting the voir dire process skillfully, extensively and painstakingly. Asking "a series of questions designed to ensure that the jurors chosen would be free from any preconceptions, biases, or prejudices which might interfere with their ability to be fair and impartial jurors," 374 Md. at 244, 821 A.2d at 465, is not enough if questions that should have been asked were not asked or were not asked properly. That is clearly what happened here. It is, after all, not those members of the venire panel who answered affirmatively to the voir dire questions at issue with whom we are concerned. Their affirmative responses disclosed relevant information bearing on their qualifications, which the court could apply in deciding their fitness as jurors. Rather, the concern is that, because they posited no answer to the voir dire questions, venire persons with the relevant associations and experiences will not be identified and, so, whether they are biased will escape consideration.
I do not accept the majority's premise that, during the individual voir dire process, the line of inquiry the petitioner could pursue was not limited or foreclosed in any way. On the contrary, I think it clearly was. As we have seen, there was a general voir dire that preceded the individual voir dire. During the general voir dire, the trial judge effectively limited and foreclosed a line of inquiry when she asked certain questions relating to associations and relationships in compound form. And she did it intentionally; when, upon objection, the petitioner asked that they be asked again, this time separately, the trial judge refused. The trial judge having decided to conduct the voir dire in this bifurcated manner, we have to assume that she ascribed some purpose to it, that it served, and had, a meaningful role to play in the jury impaneling process. And there is nothing in this record to suggest otherwise.
*481 The majority fails to explain what purpose the general voir dire questions would have served if the individual voir dire was meant to be an open forum for investigating all potential biases. Certainly, the reasonable understanding of a bifurcated voir dire process is to limit the scope of the individual examinations by identifying, for later follow-up inquiry, only those parties with potential biases. Nor does the majority realistically consider, and give sufficient weight to the fact that the petitioner unsuccessfully had objected to the improper general voir dire questions on two separate occasions. Moreover, the record reflects that the trial judge really did control the jury selection process, exercising firm control over her courtroom and the court proceedings; this is a trial judge who required counsel to pass the follow-up questions to be asked through her. It would be strange indeed if the trial judge, having decided to bifurcate the voir dire, would then allow the same questions already asked on general voir dire to be asked on individual voir dire. This is especially so since the trial judge had already rejected, albeit it was in the general voir dire setting, the very request that the majority says she did not foreclose. In order for the majority to be correct, in other words, the general voir dire would have to have been, and been intended to be, a nullity, hence a complete waste of judicial resources.
Furthermore, a reading of the voir dire transcript establishes that the purpose of the individual voir dire was to investigate the effect of any pre-trial publicity on each prospective juror and to follow-up any affirmative responses to the general voir dire questions. Nothing in the record suggests that the individual voir dire was to be used as an open forum for any subject of inquiry the petitioner desired. While it is certainly true that the trial judge did not foreclose any avenue of follow-up questions suggested by the petitioner, the follow-up questions posed by the petitioner, appropriately, and I think wisely, directly related either to affirmative responses to the general voir dire or the answers of the venireperson to questions posed on individual voir dire.
Nor do I agree that the questioning of prospective jurors 300 and 314 demonstrates that the inquiry on individual voir dire ranged beyond that allowed on general voir dire. With respect to prospective juror 300, only a portion of the court's inquiry is included by the majority. As the omitted portion of the inquiry reveals, the questions permitted by way of follow-up by the petitioner were generated by the court's pre-trial publicity inquiry:
"THE COURT: ... All right. Juror 300, please. Miss Hill?
"JUROR: Yes.
"THE COURT: Good afternoon.
"JUROR: Hi.
"THE COURT: Other than the brief description that I gave you a few moments ago, have you seen, read or heard anything about this case before you got to the courthouse today?
"JUROR: Just what's been on the news.
"THE COURT: Can you recall, specifically, what you remember from the news?
"JUROR: That it was the man that was shot, that they were robbing the jewelry store and shot a man. And it was his second job athe was a security guard, or something like that.
"THE COURT: Mm-hmm. Do you, have you formed an opinion as to the guilt or innocence already of the defendant here, Mr. White, based on what you just told me?
*482 "JUROR: Well, I just think anybody that's involved, as far as the death of a policeman
"THE COURT: Okay.
"JUROR:I just, I mean, I strongly believe that if he is accused, that he was part of it; he should go to jail. But I strongly believe in the, the death sentence, too.
"THE COURT: Okay. Do you understand the defendant is clothed with a presumption of innocence so that that presumption is not overcome unless the State would prove beyond a reasonable doubt that the Defendant was guilty of any crime. You understand that.
"JUROR: Can you repeat that again?
"THE COURT: Okay. Do you understand that Mr. White is presumed to be innocent
"JUROR: Mm-hmm
"THE COURT:unless the State proves beyond a reasonable doubt he is guilty of a crime?
"JUROR: Yes.
"THE COURT: Do you understand that you can only come to that decision after you would have heard all of the evidence in the case and listened to the instructions on the law, if you were serving as a juror in this case?
"JUROR: Yes.
"THE COURT: Do you think that you have an ability to do that, to listen to all the evidence and the instructions on the law, and then, and only then, arrive at a fair and impartial verdict?
"JUROR: I guess."
When asked if she had formed an opinion of the petitioner's guilt or innocence, prospective juror 300 responded, "... I think anybody that's involved, as far as the death of a policemanI just, I mean, I strongly believe that if he is accused, that he was part of it; he should go to jail. But I strongly believe in the, the death sentence, too." Subsequently, the petitioner asked the court to inquire of the prospective juror whether a mere accusation was sufficient to send someone to jail. While such a question may not have been permitted in a vacuum, there simply is no doubt that there was a direct and ample present predicate for it, the statement of a prospective juror that "if he is accused, that he was part of it; he should go to jail."
Similarly, with respect to prospective juror 314, when the portion of his voir dire that has been omitted is considered in context with the portions included, it is clear that the questions followed up those generated by the trial judge's pre-trial publicity inquiry:
"THE COURT: ... Juror 314, please. Mr. Long, good afternoon, sir.
"JUROR: How are you?
"THE COURT: Fine, thanks.
"JUROR: Okay.
"THE COURT: Besides the brief description that I gave you about this case a few moments ago, have you seen, read or heard anything about the case?
"JUROR: I heard stuff about it. I can't remember anything about it, or anything like that."
The colloquy simply does not support the proposition that is most critical to the majority's result, that the petitioner had free range to explore all inquiries, even those foreclosed on general voir dire.
The majority's lament that the petitioner did not request the court to ask the prospective jurors during individual voir dire the compound questions in proper form smacks of blaming the defendant for the trial court's error. The request had twice been made and twice rejected. We should not be encouraging counsel to disregard rulings by the court. In any event, *483 as I have pointed out, this trial judge was in control and counsel knew how she wanted to proceed and they proceeded that way.
What the undisputed record reflects is that the trial court conducted the voir dire examination over the course of two days. On the first day of the general voir dire, four members of the venire panel responded affirmatively to the general voir dire question relating to associations with law enforcement.[6] On the second day of the general voir dire, fourteen members of the general voir dire responded affirmatively to the general voir dire question relating to associations with law enforcement.[7] Thus, a total of eighteen prospective jurors, it must be assumed, answered the question because they had some association to law enforcement that they believed would affect their ability to be fair and impartial.[8]
Over the course of the two days of voir dire, the trial court individually questioned 104 prospective jurors. Only fourteen of those were persons acknowledging an association/relationship with law enforcement. We simply have no way of knowing how many of the 104 prospective jurors and, more to the point, how many of the 62 from which the jury was selected had the relationships or associations into which the compound questions inquired. It is precisely for this reason that reversal is required in this case. I dissent.
Judge ELDRIDGE joins in the view expressed herein.
NOTES
[1] In his Petition for Writ of Certiorari, petitioner asked this Court to address the following questions:

"1. Where defense counsel in this case made the same objections to the same questions as did counsel in Dingle v. State, 361 Md. 1 [759 A.2d 819] (2000), and where this case had not been finally decided on direct appeal at the time that Dingle was decided, did the Court of Special Appeals err in refusing to apply Dingle to this case?
"2. Under the circumstances of this case, did the Court of Special Appeals err in finding that the act of continuing the discussion with the [petitioner] after he had requested a lawyer, by reading [the petitioner] the statement of charges, was not the `functional equivalent' of interrogation?"
[2] We take no position as to whether, under some circumstances, individual, in camera voir dire might be required.
[3] Md. Rule 4-312(d), Examination of Jurors, provides as follows:

"The court may permit the parties to conduct an examination of prospective jurors or may itself conduct the examination after considering questions proposed by the parties. If the court conducts the examination, it may permit the parties to supplement the examination by further inquiry or may itself submit to the jurors additional questions proposed by the parties. The jurors' responses to any examination shall be under oath. Upon request of any party the court shall direct the clerk to call the roll of the panel and to request each juror to stand and be identified when called by name."
[4] Despite our holding in this case, we caution judges to refrain from using these types of questions when conducting voir dire.
[5] The trial judge went to extraordinary lengths to ensure the selection of a fair and impartial jury. This case generated an unusual and enormous amount of media attention. At defense counsel's request, the monument to the fallen officers of the Baltimore County Police Department, situated directly outside the courthouse, was partially draped to conceal the name of Sgt. Prothero. The record contains letters to the judge, protesting this requested action. Nonetheless, in an effort to be careful, cautious and fair, the court accommodated defense counsel.
[6] During the individual voir dire, the judge refused only once to ask a question suggested by counsel, a requested follow-up question to prospective juror No. 51. As with all the members of the venire panel, the trial judge asked the prospective juror what memory he had of media coverage of the case. The prospective juror responded: "From what, from what I've heard and, and read, the evidence points to guilt." Under further questioning, the prospective juror affirmed that he had the ability to decide the case based only upon the evidence presented at trial. Later, defense counsel requested that the trial court ask the prospective juror "what facts he believe he's heard that points to guilt." The trial court declined to ask this single question. The question did not relate to the subject of any of the compound questions. Although not struck for cause, prospective juror No. 51 was not seated on the jury. Throughout the individual questioning of 104 prospective jurors, over two full days, this was the only question which Judge Howe declined to ask.
[7] The following exchange took place between the judge, counsel and prospective juror No. 300:

"THE COURT: Do you think that you have an ability to do that, to listen to all the evidence and the instructions on the law, and then, and only then, arrive at a fair and impartial verdict?
JUROR: I guess.
THE COURT: You think you could do that?
JUROR: Yes
THE COURT: Iokay. [Prosecutor], any follow-up questions?
PROSECUTION: No.
THE COURT: [Defense counsel], any follow-up questions?
DEFENSE COUNSEL: Your Honor, if your Honor could ask [prospective juror No. 300] if she believed that the accusation is sufficient to
THE COURT: Mm-hmm.
DEFENSE COUNSEL:to require some agenda.
THE COURT: Do you believe that just because a person is accused of a crime means that they have to go to jail?
JUROR: Well, I mean, it depends onI mean, if he was, if he was caught in the act, then, yes.
THE COURT: If the State proved that; is that correct?
JUROR: Okay.
THE COURT: Not just because somebody said he did it, not just because he was charged with something or accused of something; it would require more than that; is that what you think?
JUROR: Yes.
THE COURT: And not just, just because he's accused he's automatically guilty?
JUROR: Uhm, well, it would depend on if someone actually saw him then.
THE COURT: Okay. So it would depend on the evidence, is that true
JUROR: Yes.
THE COURT:before you would have an opinion as to his guilt or innocence?
JUROR: Yes.
THE COURT: Okay. [Defense counsel]?
DEFENSE COUNSEL: I do have a motion [to strike for cause] to make, your Honor.
PROSECUTION: I don't object, your Honor."
[8] The following exchange took place between the judge, counsel and prospective juror No. 314:

"THE COURT: Okay. You believe that you have the ability to render a fair and impartial verdict in this case, based only on the evidence that you would hear and see in the courtroom
JUROR: (nodding head yes.)
THE COURT:and on the instructions on the law that I would give you at the close of that evidence?
JUROR: No.
THE COURT: Why not?
JUROR: I have a, a lot of friends that are, you know, in the police department in different sectors or, I guess, whatever in the City police, the County police and, actually, two of them been in shoot-outs before, and one of them's been shot. So just close friends. That's why.
THE COURT: That would automatically require you to do what?
JUROR: It wouldn't require me to do anything. I just don't feel like I would be of theI don't know.
THE COURT: Well, let me ask you a quick question.
JUROR: Okay.
THE COURT: Do you think you could sit in the courtroom in the jury box as a juror, listen to all the witnesses testify, look at any physical evidence that might be introduced and accepted into evidence
JUROR: Yes.
THE COURT:and then I will tell you what the law is as it would apply to this case for various crimes for which the Defendant is charged
JUROR: Okay.
THE COURT:and then and only then could you render a fair and impartial verdict? Could you do that?
JUROR: Yes, ma'am."
[9] Individual voir dire of prospective juror No. 314 proceeded as follows:

"THE COURT: Okay. [Prosecutor]?
PROSECUTION: I don't have any other questions.
THE COURT: [Defense counsel]?
DEFENSE COUNSEL: If your Honor could ask [prospective juror No. 314] how close his friends were that were in the police department that were involved in the shooting.
THE COURT: Okay. How close were those police officers that are friends?
JUROR: Just friends that I bike ride with I've known for several years.
DEFENSE COUNSEL: You ask the juror if he's discussed this particular case with his friends and
THE COURT: Right. Have you discussed this case
JUROR: No.
THE COURT:with those police officers in this case?
JUROR: No. I didn't even though [sic] what thiswhen this had happened or, you know, I heard it on the news, but that's about it. I didn't know what
THE COURT: Okay. Anything else, [defense counsel]?
DEFENSE COUNSEL: No further questions, your Honor."
[10] Maryland Rule 4-212(f) states in relevant part:

"ProcedureWhen defendant in custody. (1) ... A copy of the charging document shall be served on the defendant promptly after it is filed, and a return shall be made as for a warrant."
[1] The Sixth Amendment to the United States Constitution provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence." (Emphasis added).
Similarly, Article 21 of the Maryland Declaration of Rights provides:
"That in all criminal prosecutions, every man hath a right to be informed of the accusations against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty." (Emphasis added).
[2] The colloquy that occurred at the conclusion of the general voir dire between the trial judge and prospective juror 84, who made no response to the compound question relating to associations with law enforcement, is illustrative of this point:

"THE CLERK: Judge, before you call the next case, excuse me, the Sheriff has Juror 84 in the hall who seems upset, could you call her next.
"THE COURT: Yes, I[sic] be happy to.
"PROSECUTION: Okay.
"THE COURT: Did you hear that information, [defense counsel]?
"DEFENSE COUNSEL: I'm sorry.
"THE COURT: We were speaking with your client[,] the Sheriff has Juror 84 in the hallway. She appears to be very upset and request that we call her next. Is there any objection to that?
"DEFENSE COUNSEL: No, your Honor.
"THE COURT: Okay. Juror 84, please [].
"JUROR: Yes, ma'am
"THE COURT: You heard the brief description
"JUROR: Yes
"THE COURT:of the allegations of the facts of this case?
"JUROR: (Nodding head yes.)
"THE COURT: All right. Now you answered yes to a couple of questions. You answered yes to the question about
"JUROR: My son's a Baltimore County policeman, and he worked at J. Brown Jewelers part-time, and I can't sit here much longer.
"THE COURT: Okay.
"JUROR: I tried.
"THE COURT: I know. I understand. And what you need to do is try to get yourself together. We'll talk about the weather, or something like that.
"JUROR: Okay.
"PROSECUTION: Do you need a glass of water?
"JUROR: I tried. I really did.
"THE COURT: It's okay. It's perfectly all right. I just don't want to you turn around, around you're still so upset.
"JUROR: Right. Right. And he does deserve a fair trial. I'm, I'm just sorry. You know, I tried.
"THE COURT: That's all right. I just want to give you a couple minutes to get calmed down.
"JUROR: I'll be okay. I tried, but I just couldn't sit there.
"THE COURT: Okay. You've not discussed this with anybody else on this jury panel, have you?
"JUROR: No.
"PROSECUTION: Here. Have a sip of water.
"THE COURT: Have a sip.
"PROSECUTION: Maybe Milton can exit, help her out that door.
"THE COURT: Yeah. Milton
"THE CLERK: Yes, Judge.
"THE COURT:why don't you take her out the side door. Okay. And you're excused.
"JUROR: Thank you, very much.
"THE COURT: Thank you. You have a nice day. Is there a request to strike for cause?
"DEFENSE COUNSEL: Yes, your Honor.
"THE COURT: Strike Juror 84 for cause without objection from the State."
[3] One is left to wonder why the trial judge differentiated in the form of the question seeking the prospective jurors' victim/defendant status and those seeking information concerning certain relationships and associations.
[4] As indicated, the decision to disclose, or not disclose, an association with law enforcement is for the individual under the two-part question used in this case. But disclosure may be prompted by other information being provided. Consider the voir dire of prospective juror 67, who did not respond to either of the compound questions:

"THE COURT: Thank you. Juror Call-In 67.
"JUROR: My
"THE COURT: Good morning. Miss Kujawa
"JUROR: Yeah.
"THE COURT:have you seen, read or heard anything about this case before you came to the courthouse today?
"JUROR: Yeah. I read it and saw it on TV.
THE COURT: Okay. Can you recall, specifically, what you remember about what you may have seen or heard?
JUROR: Well, I feel that it is a police officer was killed with several children, my husband's a security guard, his brother and his nephew are former policemen and I got to be careful. I feel like I remember, have a forgone conclusion.
THE COURT: I was going to ask you that. Have you already formed an opinion?
JUROR: Mm-hmm.
THE COURT: Do you think there's a possibility that you can put all of that aside and render a fair and impartial verdict as I instruct you to do so, based only on the evidence
JUROR: NO.
THE COURT:that you heard and saw in the courtroom and on the law?
JUROR: No.
THE COURT: Okay. Could you step back to the trial table, please. Is there a motion to strike?
DEFENSE COUNSEL: I'd move to strike for cause, your Honor.
PROSECUTOR: No objection, your Honor.
THE COURT: Strike Juror Call-In 67 for cause.
[5] The majority advises that all but one follow-up question that the petitioner sought to ask was asked. It explains the one that was not asked as "not relate[d] to the subject of any of the compound questions." White v. State, 374 Md. 232, 273, n. 6, 821 A.2d 459, 483 n. 6 (2003). The majority also points out that the prospective juror, although qualified to do so, was not seated on the jury. It is interesting that the question that was not allowed followed up on a statement by the prospective juror that "from what I've heard and, and read, the evidence points to guilt." Although a single question, I am not at all so comfortable with the correctness of that decision. In fact, I believe the question should have been asked; it was clearly relevant to the prospective juror's ability to be fair and impartial and it was prompted directly by what he said.
[6] The Juror Call-In numbers reflecting an affirmative response to the question were 317, 105, 306, 004.
[7] The Juror Call-In numbers reflecting an affirmative response were 77, 318, 90, 323, 347, 85, 89, 3, 58, 314, 008, 336, 005, 75. Of this number, only ten jurors were questioned during the individual voir dire.
[8] Of the eighteen venire members positing an affirmative response to the general voir dire question, only fourteen were individually voir dired.