975 A.2d 204

**Dwayne DRAKE and Jamal Charles**

v.

**STATE of Maryland.**

No. 3021, Sept. Term, 2007.

Court of Special Appeals of Maryland.

July 7, 2009.

572

Jon Cardin and David Kennedy (Nancy S. Forster, on the brief), Baltimore, for appellant.

Sarah Page Pritzlaff (Douglas F. Gansler, on the brief), Baltimore, for appellee.

Panel: DEBORAH S. EYLER, KEHOE, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

Dwayne Drake and Jamal Charles, the appellants, were tried jointly before a jury in the Circuit Court for Baltimore City on charges arising out of the shooting death of Bryant Jones at his home. Both appellants were convicted of second-degree murder and use of a handgun in a crime of violence. Drake also was convicted of wearing, carrying, or transporting a handgun.[1] Drake was sentenced to consecutive terms of 30 years' imprisonment for second-degree murder, and ten years' imprisonment (five without possibility of parole) for use of a handgun in a crime of violence. Drake's conviction for wearing, carrying, or transporting a handgun was merged into his conviction for use of a handgun in a crime of violence.[2] Charles was sentenced to consecutive terms of 30 years' imprisonment for second-degree murder, and 20 years' imprisonment (five without possibility of parole) for use of a handgun in a crime of violence.

Drake and Charles filed separate notices of appeal, which were consolidated in this Court. They raise the following issues, which we have rephrased:

I. Did the trial court err in asking the jury on *voir dire* whether they could "not convict a defendant without quote, scientific evidence, close quote, regardless of the other evidence in the case and regardless of the instructions that I will give you as to the law"?[3]

II. Did the trial court err in denying the defendants' motion for mistrial after criticizing defense counsel's cross-examination in front of the jury?

---

1. Charles was acquitted of wearing, carrying, or transporting a handgun. Both appellants were acquitted of first-degree murder and conspiracy to commit first-degree murder.

2. *See Wilkins v. State*, 343 Md. 444, 446–47, 682 A.2d 247 (1996) (per curiam); *Hunt v. State*, 312 Md. 494, 510, 540 A.2d 1125 (1988).

3. Both parties refer to the popular television show "Crime Scene Investigation" ("CSI") to describe entertainment value scientific evidence. For brevity, we shall do likewise.

III. Did the trial court err in allowing the State to elicit testimony that a witness was afraid to cooperate with detectives?

IV. Did the trial court unduly restrict defense counsel's closing argument?

For reasons that follow, we shall affirm the judgments.

## FACTS AND PROCEEDINGS

On April 14, 2006, Tamirra Jones celebrated her 16th birthday at a party at her home, with friends and family, including her father Bryant Jones. The party began around 8:30 or 9:00 p.m., in the basement. Guests paid a $1 per person admission fee, although some were not charged. Shoelh and Takia Goode, Tamirra's cousins, collected the fees from partygoers at the front door and gave the money to Mr. Jones. There were roughly 20 partygoers in the basement, and several others upstairs.

Drake and Charles attended the party. An argument broke out between Drake and another guest, Tashima Miller. The argument was precipitated by Drake and his friends dancing roughly, "swinging their arms, bumping into people." Tamirra's parents and two adult cousins, Kim Holeman and Sharon Coston, went down to the basement to re-establish order and lay down some ground rules. The adults asked anyone carrying a weapon to leave. Charles said he had to leave and made a motion as if he were going to do so. After one of his friends said, "don't play like that, they'll take you serious," Charles stayed.

After the adults returned upstairs, Charles asked Shoelh Goode to dance, but she declined. Charles grabbed her arm. The adults went back downstairs,[4] and Tamirra took her father aside and told him she wanted Charles to leave. Mr. Jones then told Charles he had to leave.

---

4. Some partygoers testified the adults went into the basement only once.

Charles gathered his friends and urged them to leave with him. Charles, Drake, and about 11 of their friends went upstairs, along with Tamirra's parents, the other adults, and Shoelh and Takia Goode. Charles and Drake demanded their dollar back from Mr. Jones. There was some dispute as to whether Charles had paid the $1 entrance fee. Shortly afterward, Mr. Jones was shot and fatally wounded.

Kim Holeman testified that she was standing next to Mr. Jones when he was killed. They were in the doorway to the front porch. Charles and Drake were on the front porch several feet away, arguing over whether they were going to get their dollar back, when Charles shot Mr. Jones. Later that evening, Holeman was shown a photographic array and identified Charles's picture as the shooter. Charron Jones, Tamirra's cousin, also identified Charles as the shooter.

Sharon Coston's testimony about the shooting was consistent with Holeman's testimony. According to Coston, just before the shooting, Drake told Charles, "f—k this, show him how we do it in something ville." She "saw a flashing light," and then the adolescents ran from the porch. She first thought she had heard firecrackers detonating, but then realized Mr. Jones had been shot. In a statement she made to the police on the night of the shooting, however, she did not mention the remark by Drake.

Lisa Jones, Tamirra's mother and the widow of the victim, testified that she heard Drake tell Charles, "Show him how we do it in Haneysville. That's what it sound[ed] like he said." She did not see the shooting, however, because when the argument between Drake and Charles and her husband was escalating, she went inside to call 911. She then heard gunshots, returned to see her husband lying on the floor, mortally wounded, and saw Drake, Charles, and others running away.

Takia Goode testified that Drake handed something to Charles, and Charles extended his hand out in front of his body. She heard three shots and saw three flashes, but did not actually see Charles pull out a gun.

We will include additional facts in our discussion of the issues.

## DISCUSSION

### I.

The appellants contend the trial court abused its discretion when, in response to the State's proposed *voir dire* questions, and over defense objection, the court asked venire persons the following question:

> I'm going to assume that many of you, from having done a few of these, watch way too much TV, including the so-called realistic crime shows like CSI and Law and Order. I trust that you understand that these crime shows are fiction and fantasy and are done for dramatic [e]ffect and for this dramatic [e]ffect they purport to rely upon, quote scientific evidence, close quote, to convict guilty persons. While this is certainly acceptable as entertainment you must not allow this entertainment experience to interfere with your duties as a juror. Therefore if you are currently of the opinion or belief that you cannot convict a defendant without quote, scientific evidence, close quote, regardless of the other evidence in the case and regardless of the instructions that I will give you as to the law, please rise.[5]

According to the appellants, "the effect of this question was essentially to instruct the jury that they could convict ... on the evidence that they would hear in [this] case." In addition, the appellants maintain that the trial court abused the *voir dire* process by "catechizing" to the jurors, and by "determin[ing] whether jurors will be able to follow the trial court's instructions." The appellants further argue that the CSI reference "inform[ed] jurors that they need not expect evidence of scientific quality, thereby ... trivializing the State's burden of proof." The State counters that the appellants' arguments "misconstrue the court's [*voir dire*] question."

---

5. Six people responded affirmatively. All six were stricken for cause on other grounds.

The Sixth Amendment, incorporated through the Fourteenth Amendment, guarantees criminal defendants the right to a fair trial by an impartial jury. *Duncan v. Louisiana,* 391 U.S. 145, 147–50, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Article 21 of the Maryland Declaration of Rights provides a similar guarantee. *Williams v. State,* 394 Md. 98, 105–06, 904 A.2d 534 (2006). "Critical in ensuring that the guarantee is meaningful is the *voir dire* of the venire, the purpose of which is to exclude from the venire potential jurors for whom there exists cause for disqualification, so the jury that remains is capable of deciding the matter before it based solely on the facts presented, and uninfluenced by extraneous considerations." *Id.* at 107, 904 A.2d 534; *see also Curtin v. State,* 393 Md. 593, 600, 903 A.2d 922 (2006) (*"Voir dire* is the primary mechanism through which the constitutional right to a fair and impartial jury, guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights, is protected."); *Hill v. State,* 339 Md. 275, 279, 661 A.2d 1164 (1995).

"In Maryland, the sole purpose of *voir dire* is to ensure a fair and impartial jury by determining the existence of cause for disqualification, and not as in many other states, to include the intelligent exercise of peremptory challenges." *Stewart v. State,* 399 Md. 146, 158, 923 A.2d 44 (2007); *see also Curtin, supra,* 393 Md. at 602–03, 903 A.2d 922; *State v. Thomas,* 369 Md. 202, 207, 798 A.2d 566 (2002) (" 'Undergirding the *voir dire* procedure and, hence, informing the trial court's exercise of discretion regarding the conduct of the *voir dire,* is a single, primary, and overriding principle or purpose: to ascertain the existence of cause for disqualification.' ") (quoting *Dingle v. State,* 361 Md. 1, 10, 759 A.2d 819 (2000)) (other quotations omitted); *id.* at 217, 798 A.2d 566 (Raker, J., concurring) ("Maryland is one of the few states in the country that does not permit *voir dire* to inform the exercise of peremptory challenges. It has long been the rule in Maryland that voir dire is limited to the detection of bias sufficient to challenge a prospective juror for cause and not to assist in the exercise of peremptory challenges."); *Dingle v. State, supra,*

361 Md. at 13, 759 A.2d 819 ("Maryland has adopted, and continues to adhere to, limited *voir dire.*"); *Davis v. State,* 333 Md. 27, 39–42, 633 A.2d 867 (1993); *Height v. State,* 185 Md.App. 317, 331–32, 970 A.2d 921 (2009).

 "We review the trial judge's rulings on the record of the *voir dire* process as a whole for an abuse of discretion, that is, questioning that is not reasonably sufficient to test the jury for bias, partiality, or prejudice." *Stewart, supra,* 399 Md. at 160, 923 A.2d 44. *See also White v. State,* 374 Md. 232, 242, 821 A.2d 459 (2003) ("The standard for evaluating a court's exercise of discretion during the *voir dire* is whether the questions posed and the procedures employed have created a reasonable assurance that prejudice would be discovered if present."). In particular, the scope and form of questions propounded during *voir dire* generally are within the trial court's discretion. *Stewart, supra,* 399 Md. at 159, 923 A.2d 44; *White, supra,* 374 Md. at 241, 821 A.2d 459. Concomitantly, the trial judge, in the exercise of his or her discretion, "need not make any particular inquiry of the prospective jurors unless that inquiry is directed toward revealing cause for disqualification." *Dingle,* 361 Md. at 13–14, 759 A.2d 819. "[T]he exercise of discretion by trial judges with respect to the particular questions to ask and areas to cover in *voir dire* is entitled to considerable deference." *Stewart, supra,* 399 Md. at 160, 923 A.2d 44.

 With these principles in mind, we turn to the appellants' arguments. First, according to the appellants, the trial court's CSI instruction amounted to "instruct[ing] the jury that they could convict . . . on the evidence that they would hear in [this] case." We find no merit in this argument.

As the State points out in its brief, the appellants misconstrue the *voir dire* question actually asked. It was not a directive to the jurors that whatever evidence was put before them could support a conviction; rather, it was an inquiry made to identify venire persons who, without CSI-type evidence, would not convict any defendant, "regardless of the other evidence in the case and regardless of the instructions

that [the court] will give you." Thus, this question simply asked whether potential jurors could be fair and impartial in light of the evidence presented and the instructions given. *See Foster v. State*, 304 Md. 439, 453–54, 499 A.2d 1236 (1985) ("[T]his Court has consistently held that if a prospective juror 'is unable to apply the law' or 'holds a particular belief ... that would affect his ability or disposition to consider the evidence fairly and impartially,' he 'should be excused for cause.' ") (quoting *King v. State*, 287 Md. 530, 535, 414 A.2d 909 (1980)). The question aimed "to ascertain the existence of cause for disqualification." *Dingle, supra*, 361 Md. at 10, 759 A.2d 819 (internal quotations omitted). *See also Stewart, supra*, 399 Md. at 160, 923 A.2d 44 (trial judge acts within discretion when *voir dire* question was "reasonably sufficient to test the jury for bias, partiality, or prejudice"). Under Maryland law, that is precisely the purpose of *voir dire. Id.* at 158, 923 A.2d 44; *Curtin, supra*, 393 Md. at 602–03, 903 A.2d 922; *Thomas, supra*, 369 Md. at 207, 798 A.2d 566; *Dingle, supra*, 361 Md. at 10, 759 A.2d 819.

The *voir dire* question in this case is somewhat analogous to a *voir dire* question posed in capital cases: whether venire persons are unwilling to convict on the basis of circumstantial evidence. In this regard, *Corens v. State*, 185 Md. 561, 45 A.2d 340 (1946), is instructive. In that case, the defendant was charged with murdering his wife, on evidence that was circumstantial. The State proposed the following question during *voir dire*, which the trial judge adopted and asked of each prospective juror: "Have you any such conscientious scruple or opinions as would prevent or preclude you from rendering a verdict of guilty in a case where the penalty prescribed by law may be death upon what is commonly called circumstantial evidence?" *Id.* at 563, 45 A.2d 340. The Court of Appeals reasoned that, because "a person who has conscientious scruples against capital punishment," or who "would not be willing to convict on circumstantial evidence," is not impartial, such a person may be challenged for cause. *Id.* at 564, 45 A.2d 340. Consequently, the Court held that the trial court did not abuse its discretion in asking the *voir dire* question.

Especially relevant is the following comment by the *Corens* Court:

> We are unable to agree with the contention that, merely because the prospective jurors were asked on *voir dire* examination to state their views on circumstantial evidence and capital punishment, *they were thereby induced to believe that the judge was convinced before the trial began that the accused was guilty.*

*Id.* at 564–65, 45 A.2d 340 (emphasis added). Likewise, we disagree with the appellants' assertion that, by posing the CSI question on *voir dire*, the trial judge in the case at bar essentially instructed the jury "that they could convict the [appellants] on the evidence they would hear in the case[,]" as if the judge already had decided that the evidence they would be hearing would warrant a conviction.

The appellants argue the trial court abused the *voir dire* process by "indoctrinating potential jurors" in the State's theory of the case, and by attempting to determine whether venire persons were capable of following the court's instructions. As explained previously, the CSI question cannot fairly be construed as indoctrination. Rather, the question was a specific attempt to discover biases of potential jurors.

As to the allegedly instructional purpose of the CSI question, the appellants rely upon *Wilson v. State*, 148 Md.App. 601, 814 A.2d 1 (2002), to support their argument. In *Wilson*, several defendants proposed *voir dire* questions that the trial judge declined to ask. As relevant here, the questions at issue in *Wilson* were as follows:

> 15. The [d]efendant in every criminal case is presumed innocent. Unless you are satisfied beyond a reasonable doubt of the [d]efendant's guilt solely from the evidence presented in this case, the presumption of innocence alone requires you to find the [d]efendant not guilty. Is there any member of the jury panel who is unable or unwilling to uphold and abide by this rule of law?

> 22. Each [d]efendant is entitled to have his guilt or innocence determined as to each charge from the evidence which

applies to him alone. The guilt or innocence of one defendant cannot control or influence your finding of guilt or innocence as to the other [d]efendants.

Would you be able to decide the guilt or innocence of each [d]efendant on each count based solely on the evidence presented as to the individual [d]efendant and not let your decision be influenced by the evidence as to the other [d]efendants?

148 Md.App. at 656, 814 A.2d 1. Characterizing these questions as "more closely resembl[ing] jury instructions ... than *voir dire* questions," we held that "[t]he trial judge did not abuse his discretion by declining to propound [the] requested *voir dire* questions." *Id.* at 660, 814 A.2d 1.

The crucial similarity between *Wilson* and the case at bar is that the standard of review of a trial judge's decision to ask or not to ask a *voir dire* question of this sort is abuse of discretion; and the judge's discretion in that regard is very broad. "[T]he exercise of discretion by trial judges with respect to the particular questions to ask and areas to cover in *voir dire* is entitled to considerable deference." *Stewart, supra,* 399 Md. at 160, 923 A.2d 44. *Accord White, supra,* 374 Md. at 241, 821 A.2d 459; *Dingle,* 361 Md. at 13–14, 759 A.2d 819. Thus, there is no inconsistency between *Wilson* and this case, even if we were to assume, *arguendo,* that the CSI question bears some similarity to a jury instruction. The trial judge here could have declined to ask the State's question, as in *Wilson,* or could have asked the question. Either course of action would have been a proper exercise of his discretion. Moreover, the *voir dire* question in the case at bar is less like a jury instruction than were the questions in *Wilson,* and is more similar to the question permitted in *Corens, supra.* Thus, *Wilson* does not support the appellants' position.

Finally, the appellants argue that the CSI *voir dire* question was improper because it tended to minimize the State's ultimate burden of proof by informing jurors that they did not need to expect "evidence of scientific quality." In support, they cite *Boatswain v. State,* 872 A.2d 959, 2005 WL 1000565

(table) (Del. Apr.27, 2005), 2005 Del. LEXIS 168. We find no merit in this argument.

In *Boatswain,* the Supreme Court of Delaware addressed a contention that the prosecutor in a criminal trial had made an improper comment in closing argument, and that the trial judge erred in overruling the defendant's objection. The prosecutor had commented, in relevant part:

> The one issue left in this case is: Was it him? The defense would say, well—and you know they will—there's [sic] no fingerprints of him[.] They didn't print the money. They didn't find his prints on the note. In today's day and age, unfortunately, the police and the State isn't [sic] put to the same test that they wrote 200 years ago in the Constitution [in] which they said the proof must be beyond a reasonable doubt. Unfortunately, the test, of course, of criminal defendants now is, can they meet the TV expectation that they hope folks like you want. Can they meet CSI?

> [Objection overruled]

> [I]f they don't have fingerprints, he can't be guilty. On TV, they would have found fingerprints. But this isn't TV, this is real life.

2005 WL 1000565 at *1–2, 2005 Del. LEXIS 168 at *3. The court held the trial court had erred in overruling the defendant's objection, because the prosecutor's comment "denigrated the reasonable doubt standard and incorrectly stated the law." *Id.* 2005 WL 1000565 at *2, 2005 Del. LEXIS 168 at *6–7. It held that the error was harmless, however. *Id.* 2005 WL 1000565 at *3, 2005 Del. LEXIS 168 at *9.

Quite apart from whether there is any persuasive value at all in an unreported, out-of-state case,[6] *Boatswain* is inappo-

---

6. In a reported opinion, the Supreme Court of Delaware addressed a similar issue and cited *Boatswain* with approval. *Foster v. State,* 961 A.2d 526, 528–29 & nn. 4 & 9 (2008). In *Foster,* however, the defendant failed to preserve his objection to the prosecutor's CSI comments. *Id.* at 528.

site. It deals with the propriety of a prosecutor's comment in closing argument, whereas here the issue concerns the trial court's discretion to pose a particular question during *voir dire*. The only similarity we perceive in the two cases is the reference to CSI evidence. In all other respects, the cases are wholly dissimilar. In particular, here there was no incorrect statement of law or disparagement of the reasonable doubt standard.

## II.

The appellants next contend the trial court erred when it denied a motion for mistrial they made based upon the court's having criticized defense counsel in front of the jury. The mistrial motion was based upon two exchanges that occurred during the testimony of Sharon Coston. As noted above, the State called Coston as a witness and on direct she testified that the appellants stood facing the victim demanding their money back and that the shooting immediately followed, with Drake telling Charles, ". . . show him how we do it in something ville."

On cross-examination, Charles's lawyer attempted to impeach Coston by questioning her so as to show or at least suggest that certain details in her prior written statement to the police were inconsistent with certain details in her trial testimony. After an extended exchange between Charles's counsel and Coston about whether she had meant, in her statement to police, to say that some of the boys on the porch had come up from the street, or that the boys on the porch all had been expelled from the party, the trial judge, in response to an objection, said, "I think we are really beating a dead horse to death." There was no objection to the court's remark.

---

We note that the Maryland Rules prohibit citation to unreported Maryland opinions, subject to narrow exceptions not applicable here. The Rules are silent as to unreported out-of-state opinions. Md. Rule 1–104.

Also on cross-examination, Coston was questioned about her lack of cooperation in the murder investigation, so as to suggest that she was not an upstanding witness. In a bench conference, the prosecutor argued that, to the extent that defense counsel was able to create the impression that Coston had not come forward to cooperate in the investigation and therefore should not be considered reliable, the State should be able to put before the jury the fact that Coston did not come forward because she was afraid of retribution. On re-direct, when the prosecutor pursued this line of inquiry, defense counsel persistently objected, and the court announced that both defense lawyers had "a continuing objection." The following ensued:

[CHARLES'S COUNSEL]: Thank you.

[DRAKE'S COUNSEL]: We have a record, too.

THE COURT: You have a continuing objection.

[CHARLES'S COUNSEL]: Thank you, Judge.

THE COURT: You're welcome. **Sometimes objections are not for a record, sometimes they are meant to obstruct. So you have a continuing objection.**

[DRAKE'S COUNSEL]: Your Honor, that's not true.

THE COURT: Sit down. [Now directed to the prosecutor:] Ask a question.

(Emphasis added.) No objection was made.

Finally, on re-cross, after numerous objections and bench conferences, the trial judge sustained an objection by the prosecutor and again told defense counsel, "you're beating a dead horse." No objection was made. By then, it was after 5:00 p.m. on the fifth trial day. The trial judge dismissed the jury for the evening. Defense counsel then moved for a mistrial:

[CHARLES'S COUNSEL]: Your Honor, based on some of the comments from the Court I would ask for a motion for mistrial, particularly the last comments the Court in regards to the defense making objection to being friv[o]lous or obstructionist at best, along with the Court's other comments making reference to it's difficult for these wit-

nesses, making reference to Ms. Holeman for being extremely intelligent. I think that the Court's comments are bolstering the State's case. I think it is highly prejudicial, lacks any probative value, and I believe it has tainted this case where the defendant cannot get a fair trial based on the Court's comments.

THE COURT: All right.

[DRAKE'S COUNSEL]: I join.

The trial court denied the motion.

 The first thing the next morning, the judge *sua sponte* gave the following curative instruction to the jury:

In the beginning of this case, or last night I made a mistake, I made an error, and Judges make mistakes, too. So I want you to sort of pull out your eraser. Now, last night I suggested incorrectly that some of the lawyers in this case had made objections which were not for proper reasons. I was wrong. I was completely and totally wrong.

As I had the opportunity to think about it, I'm satisfied that all of the [lawyers] here and all of the objections they have made were made for a proper person—a proper purpose. I may not have agreed with it and I believe my rulings have been correct, but lawyers have the duty, they have the duty to object when they think it's proper and I'm satisfied that all of the objections in this case have made—been made by the attorneys believing that it was proper in the exercise of their duties to their clients to make the objection, and my comment to the contrary was wrong and should be disregarded by you. Thank you.

Neither defendant objected to the curative instruction. The prosecutor then called a witness.

We review a trial court's denial of a motion for mistrial for abuse of discretion. *Cooley v. State*, 385 Md. 165, 173, 867 A.2d 1065 (2005); *Wilhelm v. State*, 272 Md. 404, 429, 326 A.2d 707 (1974); *Alston v. State*, 177 Md.App. 1, 6, 934 A.2d 949 (2007). A mistrial is "an extraordinary remedy and should be granted only 'if necessary to serve the ends of justice.'" *Klauenberg v. State*, 355 Md. 528, 555, 735 A.2d 1061 (1999)

(quoting *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990)).
*See also Garner v. State,* 142 Md.App. 94, 102 n. 4, 788 A.2d
219 (2002). We will not reverse a trial court's denial of a
motion for mistrial "unless it is clear that there has been
prejudice to the defendant." *Wilhelm,* 272 Md. at 429, 326
A.2d 707. *Accord Cooley,* 385 Md. at 173, 867 A.2d 1065;
*Kosh v. State,* 382 Md. 218, 226, 854 A.2d 1259 (2004) ("The
determining factor as to whether a mistrial is necessary is
whether 'the prejudice to the defendant was so substantial
that he was deprived of a fair trial.' ") (quoting *Kosmas v.
State,* 316 Md. 587, 595, 560 A.2d 1137 (1989)); *Wilson, supra,*
148 Md.App. at 666, 814 A.2d 1 ("The trial judge is in the best
position to decide whether the motion for a mistrial should be
granted. Accordingly, we will not interfere with the trial
judge's decision unless appellant can show that there has been
real and substantial prejudice to his case.").

The appellants maintain that the trial court erred
in denying their mistrial motion. The State counters that the
appellants waived any challenge to the denial of their mistrial
motion because they did not seek a mistrial immediately after
the judge's improvident remarks; and that the mistrial argu-
ment lacks merit in any event. The appellants also complain
that the court's curative instruction was inadequate. As they
put it, "The trial court's *mea culpa* could not undo the damage
already done by undermining the credibility of defense counsel
with the jury." The State counters that that issue was waived
because the appellants failed to object to the curative instruc-
tion, and that the· instruction was adequate in any event.

We disagree with the State's first preservation argument,
but not its second. As to the first, under the circumstances,
*i.e.,* that the witness was the last of the day, in a long trial,
and her examination was extremely contentious, we see no
fault on defense counsels' parts by waiting to advance their
mistrial motion until immediately after the jury was dismissed
for the day. As to the second, respecting the contents of the
curative instruction, this issue was waived pursuant to Rule 4–
325(e), which provides that a party may not assign error in the

giving or failure to give an instruction "unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." Here, no party objected to the curative instruction after it was given to the jury (or, for that matter, at any time).

The question properly before us, then, is whether the prejudicial effect of the court's improvident remarks about defense counsel's cross-examination of witness Coston, which all agree should not have been made, was so damaging that it could not be cured by instruction, leaving a mistrial as the only reasonable remedy.

In *Dennison v. State*, 87 Md.App. 749, 591 A.2d 568 (1991), *disapproved on other grounds, Holland v. State*, 122 Md.App. 532, 547–48, 713 A.2d 364 (1998), upon which the State relies, the defendant took the stand in his trial for the homicide of a 60–year–old drinking companion. On cross-examination, the prosecutor asked him about a prior unrelated crime. Defense counsel moved for a mistrial. The trial court denied the motion, and instead gave a curative instruction to the jury. On appeal after conviction, the defendant maintained the trial court had erred in denying his motion for mistrial. He argued that the possibility of prejudice only could be removed by a mistrial (or dismissal of the charges). Rejecting that argument, we stated:

It seems apparent to us that the question asked was improper, but the forceful action taken by the trial judge was sufficient to overcome any prejudice suffered by appellant. It is generally held that the jury can and will follow curative instructions.

*Id.* at 759–60, 591 A.2d 568.

In the present case, the trial judge gave a forceful curative instruction at the outset of the next morning's proceedings, when jurors were most likely to be alert and understand it, and, furthermore, at the earliest feasible time after the error had occurred. The appellants have not rebutted the presumption that jurors ordinarily follow the court's instructions. *See,*

*e.g., Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); *Dorsey v. State,* 185 Md.App. 82, 110 n. 8, 968 A.2d 654 (2009). In our view, any possible prejudice to the appellant from the trial court's improvident remarks late on the day before was removed by the curative instruction.

The cases the appellants cite to support their contention of prejudicial error are distinguishable on their facts. In *Johnson v. State,* 352 Md. 374, 722 A.2d 873 (1999), the trial was tainted throughout by extreme rancor and repeated outbursts by the trial judge. Moreover, the trial judge in *Johnson* threatened to have defense counsel arrested for contempt of court, in the jury's presence, more than once, and actually carried out her threat. *Id.* at 388–89, 722 A.2d 873. *Johnson* is wholly inapposite to the present case.

Likewise, *Suggs v. State,* 87 Md.App. 250, 589 A.2d 551 (1991), is inapposite. In that case, as in *Johnson,* the trial judge ordered defense counsel arrested for contempt of court, and did so in front of the jury. The trial court gave a curative instruction, but the instruction blamed defense counsel for the incident. *Id.* at 257, 589 A.2d 551 ("When the jurors returned, the court informed them, 'The reason for the judge's action is because the defendant's lawyer was about ten miles out of limit.' Shortly thereafter the court asked the jury to 'disregard the sideshow.' "). We held this instruction was inadequate to cure the resulting prejudice. *Id.* (noting that the trial judge had ordered the Sheriff to "take a hold of" defense counsel in front of the jury); *id.* ("Under the totality of these circumstances, we hold that the trial judge's comments painted such a prejudicial portrait of the defense counsel as to deny appellant his right to a fair trial."); *see also Johnson, supra,* 352 Md. at 387–88, 722 A.2d 873 (analyzing *Suggs* and citing it with approval). The instruction here, unlike the one disapproved in *Suggs,* forthrightly set forth the trial judge's admission of a mistake and acknowledgment that defense counsel's objections had been made in good faith.

Finally, in *Spencer v. State,* 76 Md.App. 71, 543 A.2d 851 (1988), we held the trial judge committed reversible error by

accusing defense counsel, in front of the jury, of "sand-bagg[ing]" the court. In that case, however, the trial judge did not give a curative instruction. *Id.* at 76–78, 543 A.2d 851. Therefore, *Spencer* is distinguishable from the case at bar.

The trial judge here admitted his mistake and took prompt, forceful action to cure any possibility of prejudice his prior remarks had caused. As the Supreme Court has explained repeatedly, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *accord United States v. Hasting*, 461 U.S. 499, 508–509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In this case, the trial judge's curative instruction was sufficient to mitigate any possible prejudice the appellants may have suffered. Accordingly, there was no violation of the right to a fair trial before an impartial judge, and the mistrial motion properly was denied.

## III.

The appellants' third issue also arises out of the testimony of Sharon Coston. As we have mentioned, on cross-examination, defense counsel impeached Coston by showing that she had been uncooperative with the police investigation into Mr. Jones's death. On redirect, defense counsel objected when the prosecutor asked Coston whether, after she spoke to the police on the night of the shooting, the detectives were "able to get in touch with [her] at all." A bench conference ensued.

The prosecutor argued that any lack of cooperation by Coston had been the product of fear of retribution on her part, and that it would be unfair for the defense to be able to elicit lack of cooperation without the State then being able to elicit the reason for it. The trial court ruled that the prosecutor could ask Coston "if she's been fully cooperative and been in to see you. Tell her to answer it yes or no and that's it, okay."

Re-direct resumed, and the prosecutor elicited (over objection) that Coston had not come forward to speak to her (the prosecutor) about the case but that the detectives on the case had been able to get in touch with Coston after she gave them her initial statement. The following colloquy then ensued:

[PROSECUTOR]: Did you ever respond to any of the detectives['] calls to get in touch with you to sit down and discuss the case?

THE COURT: **Yes or no, ma'am.**

[WITNESS]: You said did I?

THE COURT: Did you respond when the police tried to get in touch with you, did you get in touch with them back?

[WITNESS]: **No, because I was afraid.**

[DRAKE'S COUNSEL]: Objection.

THE COURT: **I didn't ask you why, the answer is no.** Is that enough?

(Emphasis added.)

The appellants contend the trial judge erred in allowing the prosecutor to elicit from Coston that she had been afraid to cooperate with the detectives. The State counters that the issue is not preserved for review; the trial judge acted within his discretion in allowing the testimony in any event; and any error was harmless beyond a reasonable doubt.

With respect to preservation, the State argues that Coston's "No, because I was afraid" answer was non-responsive and the appellants' failure to move to strike it precludes their raising the issue on appeal. In support, the State cites *Hunt v. State, supra,* 321 Md. at 423, 583 A.2d 218 ("We ... point out that once again [defendant's] attorney merely objected to the answer. He did not ask the court to strike the testimony, did not move for a mistrial, and did not ask for a cautionary instruction."); *Mack v. State,* 300 Md. 583, 603, 479 A.2d 1344 (1984) ("[I]f a question is answered and subsequently an objection is made and erroneously sustained, the erroneous ruling is nonprejudicial in the absence of a motion to strike"), *overruled on other grounds, Price v. State,* 405 Md. 10, 949

A.2d 619 (2008); *Ross v. State,* 276 Md. 664, 672, 350 A.2d 680 (1976) ("Unquestionably, a motion to strike out an answer is the correct action to take where an objection to a proper question is overruled but the answer is unresponsive or otherwise inadmissible[.]"); and *Hunter v. State,* 82 Md.App. 679, 685–86, 573 A.2d 85 (1990) ("But as no timely motion was made to strike that part of her testimony, no complaint can be made of it now.").

These cases were decided prior to the adoption of the Maryland Rules of Evidence, which became effective July 1, 1994, and which "shall apply in all trials and hearings commenced on or after that date." 125TH REPORT OF THE STANDING COMMITTEE ON RULES OF PRACTICE AND PROCEDURE. Rule 5–103 ("Rulings on evidence") states in relevant part:

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling, and

(1) Objection. In case the ruling is one admitting evidence, *a timely objection or motion to strike appears of record,* stating the specific ground of objection, if the specific ground was requested by the court or required by rule[.]

(Emphasis added.)

As the transcript makes plain, counsel for Drake said "objection" immediately after Coston answered the trial judge's question by saying, "No, because I was afraid," instead of just answering, "No" (or "Yes" if that had been the case), as directed by the court. Given the continuing objection the court had granted both defendants, the fact that the court had expressly directed the witness to answer only with a "yes" or "no," and that counsel for Drake indeed immediately made his dissatisfaction known to the court, albeit by saying "objection" instead of "move to strike," the issue is preserved. And, moreover, the trial judge responded to the objection immediately, by correcting Coston's answer: "I didn't ask you why, *the answer is no.*" (Emphasis added.) By doing so, the court in fact struck the unresponsive remainder of the answer,

which was the only feasible remedy available; and neither defense counsel requested further relief (such as a mistrial).

## IV.

 Finally, the appellants contend the trial judge abused his discretion by unduly restricting defense counsel's closing arguments. Counsel for Charles expressed a desire, in conformance with her habit, to explain to the jury the reasonable doubt standard by contrasting it with other measures of proof, beginning with mere rumor, then progressing to reasonable and articulable suspicion, probable cause, preponderance of the evidence, clear and convincing evidence, and ultimately, beyond a reasonable doubt. The trial judge ruled that defense counsel would be permitted to argue from the pattern jury instruction on the reasonable doubt standard; to point out that it is the highest measure of proof recognized in the law; to compare the reasonable doubt standard with the preponderance of the evidence standard; and to exhort the jurors not to convict based on rumor or suspicion. Otherwise, defense counsel could not argue various standards of proof. The trial judge explained that the other standards counsel wished to discuss were extraneous to the case, and their inclusion in closing argument could confuse the jurors about the law.

Article 23 of the Maryland Declaration of Rights provides, in pertinent part, "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction." Until the early 1980's, that article was widely understood to give counsel broad latitude to argue the law to juries in criminal trials. *See Dillon v. State*, 277 Md. 571, 357 A.2d 360 (1976), in which the Court of Appeals said:

Since, in a criminal case, "the jury [is] not bound to abide by the interpretation of the court of the meaning of a law, but [is] free to *construe* and apply it according to their own judgments," *Franklin v. State*, 12 Md. 236, 246 (1858) (emphasis added), any instruction "as to the law of the

crime" is advisory only. Consistent with this right of the jury to exercise their independent judgment as to the law, in a criminal case, they are entitled to be informed by counsel of the legal theories of the prosecution or defense, even though such theories may be at variance with the trial court's advisory instructions....

In counsel's argument to the jury, "as Judges of Law," it has been held permissible to refer to, and to read to the jury from a legal textbook; to read from opinions of the Court of Appeals, even if the opinion be in the same case in a former appeal, insofar as the opinions relate to questions of law; and to refer to *nisi prius* decisions, directly relevant to the interpretation of a statute where there was no appellate opinion on such issue of law.

*Id.* at 580–81, 357 A.2d 360 (citations omitted). Indeed, consistent with that interpretation of Article 23, criminal jury instructions were advisory. *Compare* Md. Rule 757 (1980) *with* Md. Rule 4–325 (1985). *See State v. Adams,* 406 Md. 240, 252–53, 958 A.2d 295 (2008) (trial court in 1979 criminal trial gave advisory jury instructions based on Article 23).

In response to a due process challenge, the Court in *Stevenson v. State,* 289 Md. 167, 423 A.2d 558 (1980), held that Article 23 does not grant a jury "the power to decide all matters that may be correctly included under the generic label—'law.'" *Id.* at 178, 423 A.2d 558. Rather, in judging the law, jurors only may resolve a "sound conflict" over the law of a crime (that is, when there is a genuine conflict in interpretation of the meaning of an element of a crime, the jurors decide that dispute), and apply the law to the facts as they have found them. *Montgomery v. State,* 292 Md. 84, 89, 437 A.2d 654 (1981). The effect of the holdings in *Stevenson* and *Montgomery* was to make a trial court's instructions to the jury binding except in those rare instances in which the actual "law of the crime" is in dispute. *Id. See also In re: Petition for Writ of Prohibition,* 312 Md. 280, 318, 539 A.2d 664 (1988) (stating that "the jury's right to judge the law" under Article 23 is "virtually eliminated").

Because the holdings in *Stevenson* and *Montgomery* made almost all trial court instructions binding, so that jurors no longer were deciding the law as they had been before, the holdings naturally affected what legal arguments counsel properly could present to jurors. In *Newman v. State*, 65 Md.App. 85, 499 A.2d 492 (1985), defense counsel attempted in closing argument to read to the jury the definition of reasonable doubt as stated in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The trial court already had instructed the jury on the meaning of reasonable doubt. The State objected, and the court sustained, ruling that such argument was improper. In affirming that decision, we explained:

Arguing law includes stating, quoting, discussing, or commenting upon a legal proposition, principle, rule or statute. Quoting the Supreme Court's definition of reasonable doubt as reported in one of its opinions is arguing the law. Before 1980 when the jury's law-judging function was virtually unrestricted, arguing law, including quoting from caselaw was entirely proper and necessary because it was addressed to the judge of the law. When that function was redefined and accordingly restricted, the propriety, indeed the need, for such arguments was correspondingly diminished. In fact, the jury's involvement in some "aspects of law" was specifically and unequivocally removed. One such aspect is the burden of proof.

The burden of proof, specifically enumerated in *Stevenson*, is one of the "aspects of law" which is entrusted to the judge, and not the jury, whether there is a dispute as to the law of the crime or not. As such, the judge alone has responsibility for determining and instructing on that issue and the instructions thus given are binding on jury and counsel alike....

Accordingly, to hold that counsel are permitted to read caselaw regarding the definition of reasonable doubt to a jury, whose only function is to determine the facts and, if appropriate, the law of the case, would be to permit the usurpation of the court's function and to again place a

broader law-judging function in the jury. This, we cannot and will not do.

*Id.* at 102–03, 499 A.2d 492 (citations omitted).

Likewise, in *White v. State,* 66 Md.App. 100, 502 A.2d 1084 (1986), this Court held that the trial judge had erred by allowing the prosecutor, in closing argument, to read excerpts from applicable cases. Judge Robert M. Bell, writing for the Court, explained that the holding in *Newman* means

> that where there is no dispute as to the law, counsel will not be permitted to argue law even where the argument is "consistent" with the court's instructions.... To allow counsel to embellish the trial court's instructions is fraught with the danger that the trial judge's binding instructions will be manipulated by counsel, resulting in the jury applying law different than that given by the trial court.

*Id.* at 118, 502 A.2d 1084. We affirmed the conviction, however, upon a finding that the error was harmless beyond a reasonable doubt. *Id.* at 124, 502 A.2d 1084. *See also Miles v. State,* 88 Md.App. 360, 388, 594 A.2d 1208 (1991) (holding that trial court erred in allowing prosecutor to explain in opening statement "the undisputed law of the crime," as counsel's "[i]nstructing a jury on the undisputed law of the crime is improper whether it occurs prior to the introduction of any evidence or subsequent to the trial court's binding instructions," but that the error was harmless beyond a reasonable doubt).

The appellants rely on *Washington v. State,* 180 Md.App. 458, 951 A.2d 885 (2008), to argue that "[c]ounsel was entitled to ... broad latitude in closing argument even though the argument at issue touched on the law instead of the facts [as in *Washington* ]." *Washington,* however, addressed latitude in closing argument to argue the *facts* of the case. *Id.* at 475, 951 A.2d 885 ("[W]e agree with [the defendant] that the court made 'an impermissible decision of what was, and was not the ... *inference to be drawn from the evidence* presented.' ") (emphasis added). Here, the court limited defense counsel's latitude to argue about the *law,* not the *facts.* Other eviden-

tiary standards counsel wished to discuss, such as reasonable and articulable suspicion, probable cause, and clear and convincing evidence, were not generated by the evidence and were not relevant to the case. *See Wilhelm, supra*, 272 Md. at 413, 326 A.2d 707 ("[A]rguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking[.]"). Moreover, the trial court reasonably sought to minimize the possibility of juror confusion.

The appellants also rely upon *Stevenson v. State*, 94 Md. App. 715, 619 A.2d 155 (1993), to argue that the trial court abused its discretion by placing restrictions on the scope of defense counsel's argument on the law in closing. In that case, the defendant was complaining that the trial court had erred in permitting the prosecutor to argue the law to the jury. The prosecutor there, however, merely was explaining to the jury "how evidence that had been presented throughout the trial corresponded to the elements of the crime [charged]." *Id.* at 729, 619 A.2d 155. We held the prosecutor's summation was not "arguing the law." *Id.* Here, defense counsel's proffered argument was to be based entirely on an explanation of the law. Permitting a lawyer in closing to relate specific facts to the elements of the crime charged is not inconsistent with prohibiting a lawyer from arguing on the basis of abstract legal principles divorced from factual content. Moreover, defense counsel was given wide latitude to discuss the pattern jury instruction on the State's burden of proof, and to contrast that high burden with the preponderance of evidence standard, and with mere rumor. The court's ruling was not an abuse of discretion.[7]

---

7. We note that recently the Court of Appeals strictly limited a trial court's discretion in instructing the jury on the reasonable doubt standard in criminal trials. *Ruffin v. State*, 394 Md. 355, 363, 906 A.2d 360 (2006) ("[A]s a matter of non-constitutional Maryland criminal law, in every criminal jury trial, the trial court shall instruct the jury utilizing the Maryland Criminal Pattern Jury Instruction on the presumption of innocence and proof beyond a reasonable doubt, MPJI–CR

JUDGMENTS OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.

2:02.''). Although the *Ruffin* decision was not made on constitutional grounds, the Court pointed out that the entitlement in every criminal case to a correct reasonable doubt instruction is necessitated by due process. The *Ruffin* Court warned that, from that time forward, adherence to the pattern reasonable doubt jury instruction would be so essential that "[d]eviations in substance will not be tolerated." 394 Md. at 373, 906 A.2d 360 (footnote omitted). In the case at bar, the trial judge took care to ensure that *Ruffin's* mandate was followed, and instructed the jury on reasonable doubt by use of the pattern jury instruction.